**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **IN RE: TLI COMMUNICATIONS LLC** ) <br> **PATENT LITIGATION** ) <br> _____ ) **MDL No. 1:14md2534** <br> ) <br> **This document relates to All Member Cases** ) <br> ) <br> _____ ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF
TLI COMMUNICATIONS LLC'S OPPOSITION TO
<u>DEFENDANTS' MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

I.    **THE MEANS FOR ALLOCATING LIMITATIONS ARE DEFINITE** ........................ 1

    A.  **The '295 Patent's Disclosed Hardware Is More Than Sufficient Structure**............ 2

    B.  **Even If Disclosure Of An Algorithm Is Required Here, The Specification Discloses Numerous Examples Of Such An Algorithm.** ....................................................... 6

    C.  **Defendants' Reliance on PTAB Dicta is Unavailing.**................................................ 8

II.   **CLAIM 17 OF THE '295 PATENT IS NOT ABSTRACT** ............................................. 10

    A.  **Claim 17 is Directed to a Specific Method for Recording and Administering Digital Images Captured and Sent from a Phone to an "Intelligent Server."** .............. 11

    B.  **The '295 Patent Claims Novel Improvements to Digital Image Administration Technology.** ........................................................................................................ 13

    C.  **The '295 Patent's Inventions are Not Longstanding Practices.**................................ 15

    D.  **The Exclusions of Section 101 Are Narrow Exceptions to Patentability.** .............. 16

    E.  **Claim 17's Automated Digital Image Administration Is Not Abstract.** ................ 19

    F.  **Claim 17 is Not Directed to a Mathematical Relationship, Natural Law, or Fundamental Long Prevalent Practice**............................................................................. 20

    G.  **Claim 17 Does Not Preempt the "Building Blocks" of Technology.** ...................... 23

    H.  **Defendants' Claims of Preemption are False.** ........................................................ 23

    I.  **Defendants' Cases Highlight the Patent Eligibility of Claim 17.**............................. 26

    J.  **Claim 17 Includes Meaningful Limitations and Inventive Concepts.**..................... 30

    K.  **Claim 17 Passes the "Machine or Transformation" Test.**...................................... 31

III.  **TLI's ALLEGATIONS ARE MORE THAN PLAUSIBLE** ................................................ 32

    A.  **Factual Background**.................................................................................................. 33

        1.  **The Patent Claims**............................................................................................. 33

        2.  **The Defendants**................................................................................................. 34

    B.  **TLI's Direct Infringement Allegations Are Plausible and Well Pled** ..................... 34

        1.  **Platform Defendants Directly Infringe as Single Actors**.................................. 34

        2.  **Defendants' "Transmission System" Arguments are Not Credible**................. 39

**3.  Users and the User Defendants Are Direct Infringers as Single Actors** ......... **40**

**C.  TLI's Contributory Infringement Allegations are Plausible and Well Pled** .......... **44**

**D.  TLI's Inducing Infringement Allegations are Plausible and Well Pled** ................. **45**

**E.  TLI'S § 271(f) Allegations are Plausible and Well Pled** ........................................... **47**

**F.  Defendants' Knowledge and Specific Intent was Sufficiently Pled** ........................ **48**

**G.  TLI Withdraws its "Claim" for Enhanced Damages** ................................................ **50**

# TABLE OF AUTHORITIES

**Cases**                                                                                                 **Page(s)**

*Akamai Tech., Inc. v. Limelight Networks, Inc.*,
   692 F.3d 1301 (Fed. Cir. 2012)...................................................................................33

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
   134 S. Ct. 2347 (2014)..............................................................................17, 18, 23

*Ameranth, Inc. v. Genesis Gaming Solutions, Inc.*,
   Case No. 8:11-cv-00189-AG-RNB (C.D. Cal. Nov. 12, 2014).........................................20, 25

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*,
   133 S. Ct. 2107 (2013).....................................................................................17

*Atmel Corp. v. Information Storage Devices, Inc.*,
   198 F.3d 1374 (Fed. Cir. 1999)...............................................................................4

*Beedle v. Bennett*,
   122 U.S. 71 (1887).........................................................................................42

*Bel Fuse v. Molex Inc.*,
   No. 13-2566 (JBS/JS), 2014 WL 2710956 (D.N.J. June 16, 2014)........................................45

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*,
   681 F.3d 1323 (Fed. Cir. 2012)..........................................................................45, 49

*BMC Resources, Inc. v. Paymentech, L.P.*,
   498 F.3d 1373 (Fed. Cir. 2007)..........................................................................33, 41

*Cal. Inst. of Tech. v. Hughes Commc'ns Inc.*,
   No. 2:13-cv-07245 (C.D. Cal. Nov. 3, 2014) ..................................................................17

*Card Verification Solutions, LLC v. Citigroup Inc.*,
   No. 13 C 6339, 2014 WL 4922524 (N.D. Ill. Sept. 29, 2014)....................................18, 19, 20

*Centillion Data Sys., LLC v. Qwest Comms. Int'l, Inc.*,
   631 F.3d 1279 (Fed. Cir. 2011)........................................................................ *passim*

*Colon Health Centers of America, LLC, v. HAzel, et al.*,
   733 F.3d 535 (4th Cit. 2013)...............................................................................19

*Conair Corp. v. Jarden Corp.*,
   13-cv-6702, 2014 WL 3955172 (S.D.N.Y. Aug. 12, 2014) ..................................................45

*Cyberfone Sys., LLC v. CNN Interactive Group, Inc.*,
   558 F.App'x 988 (Fed. Cir. 2014) .......................................................................28, 29, 30, 32

*Diamond v. Chakrabarty*,
   447 U.S. 303 (1980)........................................................................................................17

*Diamond v. Diehr*,
   450 U.S. 175 (1981)........................................................................................................18

*Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*,
   758 F.3d 1344 (Fed. Cir. 2014)........................................................................26, 27, 28, 30

*In re Etter*,
   756 F.2d 852 (Fed. Cir. 1985) (*en banc*) .............................................................................9

*Exelis Inc. v. Cellco P'ship*,
   No. 09-190-LPS ..............................................................................................................36

*Fujitsu Ltd. v. Belkin Int'l, Inc.*,
   782 F.Supp.2d 868 (N.D. Cal. 2011) .............................................................................45, 47

*Genetic Techs. Ltd. v. Agilent Techs., Inc.*,
   No. CV 12-01616 RS, 2014 WL 941354 (N.D. Cal. Mar. 7, 2014) .......................................19

*Gottschalk v. Benson*,
   409 U.S. 63 (1972).....................................................................................................18, 20

*Internet Media Corp. v. Hearst Newspapers, LLC*,
   No.10-690, 2011 WL 2559556 (D. Del. June 28, 2011) .......................................................1

*K-Tech Telecomms., Inc. v. Time Warner Cable, Inc.*,
   714 F.3d 1277 (Fed. Cir. 2013)........................................................................36, 39, 40, 41

*Limelight Networks, Inc. v. Akamai Tech., Inc.*,
   134 S.Ct. 2111 (2014).....................................................................................................33

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
   132 S. Ct. 1289 (2012)............................................................................................17, 18, 21

*McRO, Inc. v. Sega of Am., Inc.*,
   No. CV 12-10327-GW, 2014 WL 4749601 (C.D. Cal. Sept. 22, 2014)...................................18

*Microsoft Corp v. i4i Ltd. P'ship*,
   131 S. Ct. 2238 (2011).....................................................................................................19

*Muniauction, Inc. v. Thomson Corp.*,
   532 F.3d 1318 (Fed. Cir. 2008)........................................................................................33

*NTP, Inc. v. Research in Motion, Ltd.*,
    418 F.3d (Fed. Cir. 2005)............................................................................................... *passim*

*Peterson v. McGladrey & Pullen, LLP*,
    676 F.3d 594 (7th Cir. 2012) ............................................................................................36

*PNC Bank, Nat'l Ass'n v. Secure Axcess, LLC*,
    Case CBM2014-00100 (U.S. Patent & Trademark Ofc., Patent Trial & Appeal Bd. Sept. 9,
    2014) .................................................................................................................................22

*Rembrandt Social Media, LP v. Facebook, Inc.*,
    950 F. Supp. 2d. 876 (E.D. Va. 2013) ..........................................................................37, 48

*Rensselaer Polytechnic Institute v. Apple Inc.*,
    C.A. No. 1:13-cv-0633, 2014 WL 201965 (N.D.N.Y. Jan. 15, 2014).....................................9

*Serv. Solutions U.S., LLC v. Autel U.S. Inc.*,
    No. 13-10534, 2013 WL 5701063 (E.D. Mich. Oct. 18, 2013)..............................................49

*SiRF Tech. v. Int'l Trade Comm'n*,
    601 F.3d 1319 (Fed. Cir. 2010)....................................................................................29, 32

*Soverain Software LLC v. J.C. Penney Corp.*,
    899 F. Supp. 2d. 574 (E.D. Tex. 2012).................................................................................37

*Tech. Licensing Corp. v. Videotek, Inc.*,
    545 F.3d 1316 (Fed. Cir. 2008)..............................................................................................2

*Tech. Patents LLC v. T-Mobile (UK) Ltd.*,
    700 F.3d 482 (Fed. Cir. 2012)..........................................................................33, 41, 42, 44

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
    659 F.3d 1376 (Fed. Cir. 2011)..............................................................................................7

*Versata Software, Inc. v.Sun Microsystems, Inc.*,
    No. 2-06-CV-358, 2009 WL 1084412 ..................................................................................19

*Vita-Mix Corp. v. Basic Holding, Inc.*,
    581 F.3d 1317 (Fed. Cir. 2009)............................................................................................36

*Westerngeco L.L.C. v. Ion Geophysical Corp.*,
    No. 4:09-cv1837, 2011 WL 3608382 (S.D. Tex. Aug. 16, 2011) ..........................................48

*Wolf v. Capstone Photography, Inc.*,
    No. 2:13-CV-09573 (C.D. Cal. Oct. 28, 2014)................................................................29, 30

*Zoltek Corp. v. U.S.*,
    672 F.3d 1309 (Fed. Cir. 2012)............................................................................................33

**Statutes**

35 U.S.C. § 101 ............................................................................................ *passim*

35 U.S.C. § 271(a) ...............................................................................34, 37, 40, 42

35 U.S.C. § 271(c) ...........................................................................................45, 47

35 U.S.C. § 271(f) ...........................................................................................47, 48

35 U.S.C. § 311(b) ..................................................................................................9

35 U.S.C. § 316(e) ..................................................................................................9

**Other Authorities**

Fed. R. Civ. P. 8(d)(2).....................................................................................36, 38

Fed. R. Civ. P. Rule 12 ...................................................................................11, 19

Fed. R. Civ. P. Rule 12 (b)(6)......................................................................1, 19, 46

## I.      THE MEANS FOR ALLOCATING LIMITATIONS ARE DEFINITE

As a threshold matter, the § 112, ¶ 6 issue involves questions of fact and is not appropriate for resolution under Rule 12(b)(6).  Patents are written for persons experienced in the field of the invention, and whether the written description adequately sets forth structure corresponding to the claimed function must be considered from the perspective of a person skilled in the art.  *Intel Corp. v. VIA Techs.*, Inc., 319 F.3d 1357, 1365-66 (Fed. Cir. 2003).  Submitted herewith is a declaration from a person of ordinary skill in the art, Dr. Hugh Smith, explaining that such a person would readily understand that the '295 Patent discloses structure corresponding to the "means for allocating" claim elements, and understand how that structure works to allocate classification information.  The '295 Patent expressly and repeatedly discloses ample structure.

Moreover, an indefiniteness determination requires this Court to engage in claim construction.  *See Internet Media Corp. v. Hearst Newspapers, LLC*, No.10-690, 2011 WL 2559556, *3 (D. Del. June 28, 2011) (denying accused infringer's 12(b)(6) motion to dismiss for indefiniteness of a means plus function limitation, because, *inter alia*, "the court would need to construe the claim in order to determine what algorithm to look for in the specification and what elements are necessary in said algorithm to satisfy § 112 ¶ 6.  This is a task that is properly reserved for summary judgment wherein the court has the benefit of a properly developed record.")  The term "allocate" is easily understood and the specification makes clear that allocating information is simply associating data with a digital image, which is also data.  Defendants suggest "allocate" must mean something more, resulting in a special structure necessary to satisfy their subjective interpretation, but fail to articulate how they intend to construe "allocate" or what special structure would be needed.

Defendants' motion is predicated on the Patent Trial and Appeal Board's ("PTAB") *sua sponte* statement in its rejection of Facebook's petition for *Inter Partes* Review ("IPR") that the PTAB did not know how the '295 Patent's structure would operate to allocate classification information.  Yet this is not surprising; the issue was never fully briefed in the IPR because, as

1

even Defendants concede, indefiniteness is not something the PTAB can decide in an IPR proceeding.  Were the issue briefed, TLI would have noted that (i) even a cursory examination of the specification shows substantial and definite structure, (ii) a person of ordinary skill in the art would have readily understood the specification and the disclosed structure (in the IPR's preliminary stage, patentees are not permitted to submit declarations) and (iii) during prosecution of the patent, *it was the patent examiner*, not the applicant, who added the "means for allocating" limitation to claim 1 via an examiner's amendment.  The original patent examiner, considered a person with experience in the field of the invention, understood the term and thought it definite.

Because Defendants failed to demonstrate facts and satisfy their burden of proving "means for allocating" is indefinite by clear and convincing evidence, their motion should be denied.  *See Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1339 (Fed. Cir. 2008) (finding accused infringer "did not carry its burden to prove [asserted claim] was indefinite" where patentee offered evidence "that technology to perform the claimed function was available at the relevant time and would have been known to a person skilled in the art," but "[t]he only evidence that Gennum presented…was the testimony of its expert that he personally was not aware of any then-existing hardware that could perform the claimed function.")

## A.    The '295 Patent's Disclosed Hardware Is More Than Sufficient Structure

Defendants' motion ignores numerous examples of structure for allocating classification information detailed in the specification of the '295 Patent.[1]  As the specification describes:

> In the illustrated embodiment [of Figure 2], a means MZ is provided in the telephone unit TE for allocating the classification information OM which are prescribed by the user to the digital images and thus characterizing the digital images. In terms of its function, **the allocation means MZ may be integrated into the keypad TA, for example, by using key combinations**. The telephone unit TE also includes **a speech recognition unit which converts open speech into text**. The text can then be allocated to the digital images and transferred with

[1] For purposes of opposing Defendants' motion, TLI addresses the "means for allocating classification information" limitation of claim 1, along with the "means…to allocate the classification information" limitation of claim 25.

2

the digital image data. Referring to FIG. 4, the various possibilities for the
classification information OM are illustrated. The classification information OM
which are unambiguously allocated to the digital images serve to characterize the
digital images so that a surveyable, unambiguous storage of the digital images in
the server S may be carried out in such a way that the digital images can be
quickly relocated in their stored locations.

Ex. 1, at 6:42-58 (emphasis added)[2]; *see also id.* at 7:20-24 ("In a preferred embodiment, the

classification information OM as shown in FIG. 4 include the following types of data: an

arbitrary form of audio data 401 such as melodies, songs, noises, or speech 402 which is spoken

into the telephone unit TE by the user. . . ."); 8:6-10 ("The classification information OM may be

prescribed by a user of the telephone unit TE, for example, by simply speaking the information

into the microphone LS of the telephone unit TE or by inputting a character sequence into the

key pad TA."); (Smith Dec. ¶¶ 8-9)  The information input at the keypad or speech recognition

unit is converted into digital ASCII data.  *See* Ex. 1, at 6:48-49; 7:42-44; (Smith Dec. ¶¶ 9, 17).

The specification teaches a person of ordinary skill in the art that when classification

information data is being generated, the phone was placed in "image pick up and transmitting unit"

mode as opposed to "normal telephone" mode, via the mode key MT (Ex. 1, at 6:13-23), telling

such a person that entered data will necessarily be associated with digital images (*e.g.*, in contrast

to the data being used for a telephone call). (Smith Dec. ¶¶ 10, 17).  The specification also teaches

the telephone unit includes "memory TS [that] is provided for storing the images registered by the

digital image pickup unit in digital form," and "a data processor P which includes a memory

RAM." Ex. 1, at 6:2-8; (Smith Dec. ¶ 11).  The data processor "serves for processing the digital

images…[and] can be used for other processing tasks as well, including… pattern recognition or

voice recognition within the telephone unit TE." Ex. 1, at 6:8-12; (Smith Dec. ¶ 11).

In addition, the phone's functions may be controlled via operating field BE depicted in

Figure 2, the operating field BE can also operate as the phone's display, and the operating field

BE may be integrated into the phone's keypad TA and/or be integrated with other phone

---

[2] Exhibits 1-9 are attached to the Declaration of Eric Berger filed herewith.

controls. *Id*. at 6:24-35; (Smith Dec. ¶ 12). The specification also states that operating field BE may be helpful in the "allocation of speech spoken by the user to individual digital images." *Id.*

The specification thus discloses ample structure for allocating classification information to the digital image when a user inputs classification information at the phone. A person of ordinary skill in the art would understand the structure for "allocating classification information" is at least the phone's keypad, controls, display, operating field, digital character generator (*e.g.*, ASCII generator), classification information allocator, mode key, processor, memory, microphone and/or speech recognition unit. (Smith Dec. ¶¶ 8-13). Because the specification defines much more than "some" structure for this limitation, one of ordinary skill in the art would plainly know the bounds of the invention, and the claim term is not indefinite. *See Atmel Corp. v. Information Storage Devices, Inc.*, 198 F.3d 1374, 1382 (Fed. Cir. 1999) ("[a]ll one needs to do in order to obtain the benefit of [§ 112, ¶ 6] is to recite *some* structure corresponding to the means in the specification."); (Smith Dec. ¶¶ 13-14).

To manufacture their invalidity argument, Defendants ignore the patent in its entirety, including the foregoing examples of structure explicitly disclosed in the specification, and point only to the classification information allocator "MZ" in Figure 2 as the corresponding structure, despite the patent expressly incorporating additional structure into that allocator.

Building on their false premise that MZ is the only disclosed structure (it is not), Defendants argue that the patent purportedly does not describe "how" that component allocates classification information to the digital images. There are multiple problems with this argument. First, the patent expressly states that MZ is not a black box because "the allocation means MZ *may be integrated into the keypad TA*, for example, by using key combinations." Ex. 1, at 6:46-47 (emphasis added). Second, the specification tells a person of ordinary skill in the art that a user types alphanumeric data into the keypad, and this information is converted into digital ASCII data : "alphanumeric data which may be input into the telephone unit TE via the key pad

4

TA in, for example, an ASCII format 406." *Id*. at 7:42-44.  A person of ordinary skill in the art recognizes this ASCII generator as structure that allocates classification information to the digital image. (Smith Dec. ¶¶ 9, 13, 17).  The classification information is allocated to (*i.e*., associated with) digital images in the form of digital ASCII data created by the keypad as the user types the desired classification information into the keypad in reference to the selected image. (Smith Dec. ¶ 17).  The patent also teaches that the phone is in "image pick up and transmitting unit" mode during the input of classification information, rendering it simple for a person of ordinary skill in the art to understand classification information and digital images are associated.  *Id*.

Defendants contend allocating requires more than generating classification ASCII data, but nothing more is required.  The patent teaches structure that converts alphanumeric text to digital ASCII data associated with an image (and thus discloses structure).  And the digital classification information data (*e.g*., ASCII data) is created via keyboard input or spoken voice. This data is then transmitted with the digital image data.  The specification plainly discloses structure (*e.g*., keypad and voice input that create ASCII data), and that structure is clearly linked to the performance of the claimed function (for allocating).  A person of ordinary skill in the art is readily capable of ascertaining from the patent what the claim means, what structure exists that corresponds to the claimed function and how that structure operates.  (Smith Dec. ¶¶ 8-17).[3]

Defendants' arguments also ring hollow in view of Defendant Facebook's prior contradictory position, where it recognized the '295 Patent's allocation of classification information required nothing more complex than simply associating classification information with digital images.  In a recent litigation alleging infringement by Facebook of patents related to texting and uploading digital images ("Summit 6 litigation"), Facebook and its then-expert, Dr.

---

[3] Defendants misleadingly assert that the patentee "reli[ed] on this feature [i.e. "the 'allocation' of 'classification information' to digital images] as a point of novelty." D.I. 87 at 14.  The patent does not purport to claim a novel method for the trivial task of ***how*** to associate one piece of digital information with another piece of digital information.  Those methods were well-known at the time.  *See infra*; *see* Smith Dec. ¶¶ 8-25.

Rhyne, relied heavily on the '295 Patent and touted its teachings as key prior art for cellular phone transmission of digital images. Dr. Rhyne recognized the '295 Patent (*i.e.*, Mattes) disclosed structure for allocating classification information to the digital images. Ex. 2, at ¶ 72 ("Telephone systems similarly linked user identifiable information, such as an address, to the transmitted media data. (*See,* for example, Mattes[] 2:11-14; 4:5-8; 8:40-45.)") Facebook settled with Summit 6 shortly before trial, but Dr. Rhyne testified at trial on behalf of Facebook's co-defendant Samsung that the '295 Patent's keypad associates the classification information to the digital images (just as the specification teaches):

> [A]nd the last thing you can do is key pad enter data. . . . And we saw what that classification information can be. It can be a telephone number, it can be a keyed in message, it could even be a snippet of voice. . . .It means that when you say that I'm going to have this digital – this classification information that's associated with classifying the picture . . . . It can be received by keying it in. It can be received by speaking it in. . . .

Ex. 3, at 127-129. Thus, long before this litigation started, Facebook's expert opined that the classification information in the '295 Patent is simply "associated with" uploaded digital images using a keypad and then transmitted with the digital images. Before the present suit, Facebook expressed no confusion or inability to determine the '295 Patent's structure that allocates classification information.

**B.      Even If Disclosure Of An Algorithm Is Required Here, The Specification Discloses Numerous Examples Of Such An Algorithm.**

Even assuming *arguendo* that (i) the classification information allocator MZ is the only structure described in the patent (it is not) ***and*** (ii) the specification is required to disclose more structure than it already does (*e.g.*, an algorithm) as to how that structure allocates classification information to digital images, the specification plainly discloses such additional structure.

All that is required for a computer implemented means limitation is that "the patent . . . disclose sufficient structure for a person of skill in the field to provide an operative software program for the specified function." *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385-86 (Fed. Cir. 2011) ("A description of the function in words" may suffice, and it is enough

to "recite[ ] in prose the algorithm to be implemented by the programmer.")  Here, the

specification discloses that allocating classification information to digital images is simply

associating digital classification information data with digital image data such that both types of

data can be transmitted together over telecommunications lines.  *See, e.g.*, Ex. 1, at 2:10-14

("The telephone unit may associate classification information with the digital images. A

transmission system is coupled to the telephone unit and to a server for transmitting of the data

which includes the digital images and potentially the classification information from the

telephone unit to the server."), 3:33-38 ("The recognized speech data can be easily transmitted

with the image data since the compression rate for recognized speech data (which is in the form

of text) is greater than for the audio information."), 2:39-41 ("[T]ransmitting data which contains

the digital images as well as classification information which characterize the digital images to a

server"), 2:51-58 ("Addition data may be transmitted with the digital image data as well.

Classification information which is found in the transmitted data is extracted in the analysis unit.

. . ."); *see also id*. at 4:38-41, 4:5-11, 4:55-57, 8:11-15.

     One of ordinary skill in the art reading the specification readily understands the algorithm

for allocating classification information is causing the classification information data to be

associated with the digital images, *e.g.*, to be transmitted with each other in a data stream. (Smith

Dec. ¶¶ 18-20).  Such a "data stream" was discussed during prosecution.  Ex. 4, at TLI0000182-

83.  The patentee and examiner plainly understood allocating classification information was the

simple creation of a data stream containing the classification data and digital image data.

Making such an association in view of the specification would have been straightforward for one

of ordinary skill in the art in 1996 using relevant industry standards.  (Smith Dec. ¶ 21).

     The patent gives examples of algorithms that can be used to allocate classification data to

image data: "[t]he classification information OM may also be included in the transmitted data …

This information can be included as a header field provided with the transmitted message that

contains the image data and, as such, analysis thereof is quite simple." Ex. 1, at 7:6-19. A person of ordinary skill in the art understood how to use header fields to allocate classification information data with digital image data. (Smith Dec. ¶ 22).

The specification also teaches "[t]he recorded images may be forwarded to a server via the Internet or may be directly displayed on a page of the World Wide Web." Ex. 1, at 8:33-35; *see also id*. at 4:44-45. One of ordinary skill in the art would have readily understood the standard protocols for communicating data over the Internet, including HTTP (HyperText Transfer Protocol) RFC 1945 and others, and would have readily known how to allocate/associate classification information data to image data via transmissions over the Internet, using the many published and standardized methods of the time. (Smith Dec. ¶ 23).

It is therefore clear that the specification contains ample structure for the "means for allocating classification information" limitations (*id.* at ¶ 25), and Defendants' unsupported attorney-argument that the specification does not provide information to one of ordinary skill in the art to determine the bounds of the means for allocating limitations should be rejected.[4]

### C.     Defendants' Reliance on PTAB Dicta is Unavailing.

Because Defendants cannot credibly demonstrate by clear and convincing evidence, as they must, that the specification does not disclose *some* structure, they instead cling to statements in the PTAB's denial of Facebook's IPR petition as purported "evidence." But Defendants' reliance on the PTAB's denial of Facebook's IPR petition is misplaced. First, as Defendants' concede (D.I. 87. at 10 n.4) the PTAB does not have authority to invalidate a patent claim on the basis of indefiniteness in an IPR proceeding (*see* 35 U.S.C. § 311(b)), and thus the PTAB's comments in this regard are dicta. Because indefiniteness was not properly before the PTAB, and because the IPR was not instituted, TLI did not have the opportunity to fully brief the issue,

---

[4] Defendants' reliance on *Finisar*, *ePlus*, and *Blackboard* is misplaced, because unlike here, each of those decisions involved black boxes or functions that had no supporting disclosure in the specification, and simply restated the claimed function.

and was not permitted to file an expert declaration on the issue.  Thus, it is not surprising that the PTAB's decision failed to address all the clear evidence of structure referenced above that is disclosed in the specification (*e.g.*, transmitting classification information as data "with" digital image data; including classification information as header field with digital image data, etc.). The PTAB's dicta cannot substitute for Defendants' lack of clear and convincing evidence.

Second, any PTAB statements concerning the scope of the claims are not binding on district courts, as the PTAB does not engage in the same claim construction analysis as district courts.  *See Rensselaer Polytechnic Institute v. Apple Inc.*, C.A. No. 1:13-cv-0633, 2014 WL 201965, *9 (N.D.N.Y. Jan. 15, 2014).  Moreover, unlike in district court cases, patent claims are not presumed valid in PTAB proceedings and do not require clear and convincing evidence to support a finding of invalidity.  *See* 35 U.S.C. § 316(e) (IPR uses preponderance of the evidence standard); *In re Etter*, 756 F.2d 852, 858 (Fed. Cir. 1985) (*en banc*) ("§ 282 [i.e., presumption of validity] has no application in reexamination proceedings.")

In addition, the PTAB's statements concerning the means for allocating limitations cannot credibly support a finding of indefiniteness where ***it was the patent examiner in charge of the prosecution of the '295 Patent who added the "means for allocating" limitation*** to claim 1 via an Examiner's Amendment.  Ex. 4, at TLI0000191.  The original patent examiner plainly understood this limitation and evaluated it in view of the prior art during his extensive (almost three years) examination of the claims of the '295 Patent.  Indeed, the original patent examiner issued a Notice of Allowability wherein he expressly acknowledged that structure supported the means for allocating classification information limitation.  *See id*. at TLI0000194 ("Applicant's independent claims 1 and 27 each recite, inter alia, a communication system for recording and administering digital images ***with a structure defined in the specification (pages 9-15) as including a telephone unit comprising digital pick up unit for recording digital images and means for allocating classification information pertaining to the digital images as prescribed***

9

*by a user of the telephone unit to characterize digital images obtained by said digital pick up unit*. . . .") (emphasis added).

The "means for allocating" limitation did not simply slip through the cracks during prosecution.  Rather, the patent examiner -- considered to have experience in the field of the invention -- was fully aware of the means for allocating limitation.  He considered the limitation against the prior art, added it to claim 1, and determined it was fully supported by recited structure.  Defendants have offered no evidence that the means for allocating limitations are indefinite, and they simply rely on the PTAB's dicta.  Even a cursory file history review rebuts the PTAB's dicta and at least reveals a genuine issue of material fact that is fatal to Defendants' motion.  Defendants' motion should thus be denied.

## II.     CLAIM 17 OF THE '295 PATENT IS NOT ABSTRACT

The '295 Patent claims a specific novel system and method for the automated archiving at an intelligent server of digital images sent from a telephone, based on user prescribed classification information.  Specifically, the patent claims a system and method for recording and administering digital images in which, on the front end, a user can use a telephone to capture digital images and associate classification information with them, and then transfer the digital images over a communications network to an intelligent server that receives the images and classification information, extracts the classification information from the transmitted data, and stores the digital images at the server taking into consideration the classification information.

The claims here bear no resemblance to the types of claims that the Supreme Court has found abstract under § 101.  The claims do not cover a natural law, mathematical relationship, or fundamental economic practice, and do not preempt any building blocks of technology.  Rather, the claims represent significant improvements in digital image administration technology, include meaningful limitations that represent inventive concepts, and that pass the "machine or transformation" test by claiming a specific machine (*i.e.*, a particular intelligent server) that plays

10

a significant part in permitting the claimed method to be performed.  Viewed in the light most favorable to TLI, these facts require denial of Defendants' Rule 12 motion on patent eligibility.

A.     **Claim 17 is Directed to a Specific Method for Recording and Administering Digital Images Captured and Sent from a Phone to an "Intelligent Server."**

The invention disclosed in Claim 17 is the result of Dr. Mattes' work as a scientist at Siemens AG in the mid-1990s.  Dr. Mattes recognized that mobile telephony and digital photography, each then in their infancy, were likely to greatly increase in popularity and lead to a proliferation of recorded digital images.  (D.I. 1,(1:14-cv-00139) ("Google Complaint"), ¶ 17) At that time, camera phones as we know them today did not exist.  In fact, the first cellular phone with an integrated camera was not released until 2000, four years after the '295 Patent's effective filing date. Ex. 5, at 33.  The first Apple iPhone was released in 2007.  Ex. 6.  Cellular telephone plans were expensive not in widespread use.  Ex. 7.  The World Wide Web was in its infancy -- the first major web browser (by Netscape) was released in 1994, and was fee-based, followed in late 1995 by Microsoft's Internet Explorer.  Ex. 5, at 33.  Google was incorporated in 1998.  Ex. 6.  Flickr, considered the first digital image hosting database, did not exist until 2004 (and, even then, did not upload images from cellular phones having cameras).  The world was very different in June 1996 when Dr. Mattes filed his priority patent application.

One significant challenge to creating a camera phone at the time was that the memory chips used for storing digital images on a cellular phone had small storage capacity and were expensive.   Only a few digital images could be stored in memory, greatly limiting the number of digital images a user could capture.  Dr. Mattes recognized the storage problem had to be solved before a camera phone could become a reality.  Dr. Mattes recognized storage external to a phone was needed to store a substantial number of digital images, but this created the additional problems of how to get the digital images from the phone to the external storage system, and how to simply and efficiently organize a large number of digital images sent to the external storage system.  This problem is compounded for a data storage system with many users.

11

Otherwise stated, "[w]hen a large number of digital images are recorded and are to be archived in a central computer unit, then the organization of the data base becomes a problem." Ex. 1, at 1:43-45.  To solve this problem, Dr. Mattes therefore invented a system and process for the automated administration of digital images sent from a telephone unit (*e.g.*, a camera phone) to an intelligent server.  *See* Ex. 1, at 2:5-65.  Dr. Mattes' invention addresses this technical problem by enabling the "recording, administration and archiving of digital images simply, fast and in such a way that the information therefor may be easily tracked."  *Id*. at 1:64-66.  The invention "simplifies transmission of digital images which have been recorded, optimizes the communication of the image data and provides a method for administering the storage of the digital images which is simple, fast and surveyable so that the digital images may be archived."  *Id*. at 1:67-2:4.

To help achieve these goals, Dr. Mattes invented an entire communications system and method for recording and administering digital images.  Ex. 1, at 2:5-65.  In this system, multiple users can use their telephones to transmit and store digital images at a particular server.  *Id.* at 4:61-65, fig. 1. On the front end, Dr. Mattes invented and claimed the use of a particular telephone unit with the ability to record, store, and process digital images, and to associate classification information with those images.  *Id*. at 2:7-12.  On the back end, Dr. Mattes invented and claimed the use of a specific intelligent server that includes, in addition to a receiving unit and memory, a special analysis unit.  *Id*. at 2:15-18 ("[t]he server has . . . an analysis unit for analyzing the data [sent by the telephone unit] with respect to the classification information which characterize the digital images."); *see also id.* at 2:55-59 ("Classification information which is found in the transmitted data is extracted in the analysis unit and are used for storing the digital images in such a way that they can be easily relocated."); *and id.* at 5:47 ("The analysis unit AE provides the administering function.").

After the server receives the digital images and classification information, the server's analysis unit automatically extracts and analyzes the classification information and stores the

digital images in server memory taking into consideration the classification information.  *Id*. at 2:55-65; *see also, e.g., id*. at Claims 1, 17, and 25.  "In this way, it is possible to implement an automated archiving of digital images in the server.  Since the storing step depends on the extracted classification information that characterize the individual digital images, a simple, fast and surveyable archiving of the digital images is automatically carried out."  *Id*. at 2:61-65.

In 1996, Dr. Mattes' purportedly "known and abstract" system and method of administering digital images invention was among the winners of a Siemens idea competition, leading to Siemens initiating a project to develop a integrated cellular telephone and camera. (Mattes Dec. ¶ 1).[5]  In March 1997, Dr. Mattes demonstrated a prototype of his invention at CeBIT '97, a large international computer exposition in Hanover, Germany.  (Mattes Dec. ¶ 2). In response to seeing the CeBIT prototype, the television media profiled Dr. Mattes's invention on a morning news program.  (Mattes Dec. ¶ 2).  Dr. Mattes' invention was far from a representation of a longstanding practice.  The use of a telephone unit to capture, save, and process digital images and associate classification information with those digital images for transmission to an automated archiving system is the opposite of a longstanding practice.  It did not exist before the '295 Patent.  Likewise, the automated archiving of digital images by an analysis unit and storage mechanism in the same system (*i.e.*, the server) taking into consideration classification information is the opposite of a longstanding practice.  It too did not exist before the '295 Patent.

### B.     The '295 Patent Claims Novel Improvements to Digital Image Administration Technology.

Prior to the '295 Patent, different techniques were used to administer digital images. Digital camera users could store digital images on external computers or hard drives by creating

---

[5] To put this in perspective, Siemens AG is one of the world's oldest and largest companies.  In 1996, it employed over almost 380,000 people worldwide and was involved in the design and development of a wide variety of products, including power plants, medical equipment, semiconductor devices and cellular telephones.  In 1996, Siemens' engineers and scientists submitted over 5000 in-house invention disclosures.  *See* Ex. 9.

folder structures corresponding to the manner in which the user wanted to organize the images. Users could save and organize digital images by giving the images file names corresponding to information the user chose to identify the images.  But these previous approaches could be time consuming and complicated for the user, particularly when a large number of digital images were involved, because the user would have to manually sort, organize, and store the digital images.

Digital images have also been administered by assigning classification information not prescribed by a user, such as an automatic date and time stamp created by the device that captured the digital image.  Similarly, digital images can be administered using a file name corresponding to the date and time at which the digital image was captured that is automatically assigned to the digital image by the device that captured the digital image.  Indeed, any digital image technique in which classification information is attributed to a digital image but is not user prescribed would not be covered by the '295 Patent claims.

The '295 Patent teaches a new system and method for recording and administering digital images that achieves "a simple, fast and surveyable archiving of the digital images [that] is automatically carried out."  '295 Patent, 2:63-65.  To accomplish this, a particular telephone is used to capture, store, and process digital images and associate classification information with those digital images, *Id*. at 2:7-12.   An intelligent server automatically archives the digital images based on the user prescribed classification information.  *Id.* at 2:55-65.  This automated archiving of the digital images by and at the server provides a fast and easy way for digital images to be automatically administered based on user input classification information.

> Classification information which is found in the transmitted data is ***extracted in the analysis unit*** and are used for storing the digital images in such a way that they can be easily relocated, even when a great number of digital images are stored and administered.  In this way, it is possible to implement an ***automated archiving*** of the digital images in the server.  Since the storing step depends upon the extracted classification information that characterize the individual digital images, a simple, fast and surveyable archiving of the digital images is ***automatically carried out***.

*Id*. at 2:55-65 (emphasis added).

The '295 Patent claims a specific method and system and does not preempt the building blocks of digital image recording and administration. A wide range of alternative digital image recording and administration techniques remain available to the public, including any technique in which the classification information is not prescribed by the user, or in which a system (*e.g.*, the claimed server) does not analyze the classification information and store the digital images taking into consideration the classification information.

### C.     The '295 Patent's Inventions are Not Longstanding Practices.

Far from a long prevalent practice, this method and corresponding system did not exist prior to Dr. Mattes' invention. (Smith Dec. ¶ 26). Never before could users capture digital images and allocate classification information at their telephones, transmit the digital images and classification information from their telephones to a server (or any other device), and have the server (or similar device) receive the data, extract classification information that characterizes the digital images, and intelligently store the digital images on the server in an automated manner based on the classification information. *Id*. at ¶¶ 26-27. The novel nature of such a system is highlighted by the failure of the prior art to teach the claimed intelligent server. The patent examiner who issued the '295 Patent was unable to find any past teachings of such a server, and defendant Facebook was unable to identify such a prior art server during its failed attempt to have the PTAB institute an *inter partes* review ("IPR") of the '295 Patent.

To overcome prior art during prosecution, the patentee successfully argued that the claimed invention "enable[s] an ***automatic archiving in the server*** of the image data . . . rapidly and in uncomplicated fashion." Ex. 4 at TLI0000144. "Such a scenario is not even suggested" in the cited prior art. *Id*. at TLI0000145. The prior art contained no indication of expanding the basic telephone communication system described in the prior art "into a communication system with an 'intelligent server.'" *Id*.

15

Defendant Facebook also failed to find any prior art that taught the specific intelligent server claimed in the '295 Patent.  Facebook's IPR request was based on seven prior art references that had not been previously considered by the original patent examiner who approved the '295 Patent for issuance.  In declining to institute Facebook's IPR request, the PTAB focused on the server limitations of Claim 17.

> We agree with [TLI] that [Facebook] has not established that Witek teaches the "storing the digital images in the server, said step of storing taking into consideration the classification information" limitation recited in claim 17. [Facebook] does not direct us, with any specificity, to evidence demonstrating sufficiently that Witek teaches storing digital images in computer 12 *after* the classification information is extracted from the pict fax file 15.

(D.I. 47-1, at 16 (emphasis in original).)  The PTAB further noted that the ability of the Witek system to "permanently store received faxes does not demonstrate that the Witek system stores digital images in the server, taking into consideration the classification information, as required by claim 17." *Id.*, at 17.  In effect, the Witek system functioned as a passive storage server, not the intelligent server taught in Claim 17 that extracts and analyzes classification information and stores digital images in the server taking into consideration that classification information.  At least because Facebook failed to show the intelligent server claimed in the '295 Patent was in any of Facebook's prior art references, the PTAB did not institute the IPR petition.  *Id.* at 17-18.

It is unsurprising that neither Facebook nor the original patent examiner could find any prior art teaching of a server that both analyzes the classification information and stores the digital images taking into consideration the classification information.  The automatic archiving of images based on classification information by an analysis and storage system (*e.g.*, the claimed intelligent server) is not a longstanding practice.  It did not exist prior to the '295 Patent.

**D.      The Exclusions of Section 101 Are Narrow Exceptions to Patentability.**

Section 101 broadly permits patenting of "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."  35 U.S.C. § 101.  "Congress intended statutory subject matter to 'include anything under the sun that is

16

made by man.'"  *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980) (internal citations omitted).

Section 101 has limits, however, and "laws of nature, physical phenomena, and abstract ideas"

have been excluded from patent eligibility.  *Id.*  These narrow exceptions have been carved out

because they "are basic tools of scientific and technological work."  *Ass'n for Molecular*

*Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013) (*quoting Mayo Collaborative*

*Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012)).  But the Court has warned that

"too broad an interpretation of this exclusionary principle could eviscerate patent law.  For all

inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural

phenomena, or abstract ideas."  *Id.* (*quoting Mayo*, 132 S. Ct. at 1293).

   To determine patent eligibility under § 101, courts must engage in the two part *Mayo* test

affirmed in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2358 (2014).  First, "a court

must ask if the claim is 'directed to one of those patent-ineligible concepts' – a law of nature,

physical phenomenon, or abstract idea."  *Cal. Inst. of Tech. v. Hughes Commc'ns Inc.*, No. 2:13-

cv-07245 (C.D. Cal. Nov. 3, 2014) (Denying Defendants' Motion for Summary Judgment on 35

U.S.C. § 101 Ineligibility), at 5 (*quoting Alice*, 134 S. Ct. at 2355).  "To do this, the court must

identify the purpose of the claim—in other words, what the claimed invention is trying to

achieve—and ask whether that purpose is abstract."  *Id.* at 24.  Examples of likely abstract

purposes are longstanding practices and "basic tools of research and development, like natural

laws and fundamental mathematical relationships."  *Id.*

   A claim considered abstract under the first step must then be evaluated for "an 'inventive

concept' that 'ensure[s] that the patent in practice amounts to significantly more than a patent

upon the [ineligible concept] itself.'"  *Caltech*, at 5 (*quoting Alice*, 134 S. Ct. at 2355).  To meet

the second step, a claim "should provide 'additional features that provide practical assurance that

the process is more than a drafting effort designed to monopolize [the ineligible concept] itself.'"

*Id.* at 25 (*citing Mayo*, 132 S. Ct. at 1297).  Here a "court must also consider claim elements as a

combination." *Id.* at 26; *see also Diamond v. Diehr*, 450 U.S. 175, 188 (1981) ("[A] new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made.").

The primary concern of the two-part test and § 101 analysis generally is preemption. *See Alice*, 134 S. Ct. at 2354. "This preemption concern underlies both steps of the analysis." *Caltech*, at 22. The Supreme Court has made clear its "concern that patent law not inhibit further discovery by improperly tying up the future use of [the] building blocks of human ingenuity." *Alice*, 134 S. Ct. at 2354 (*quoting Mayo*, 132 S. Ct. at 1301) (internal quotation marks omitted). These "building blocks" include "basic tools of mathematics, as in *Benson*, or formulas describing preexisting natural relationships, as in *Mayo*." *Caltech*, at 22. But all inventions relate to abstract ideas at some level, and use of an abstract idea that is an "application . . . to a new and useful end" is patent eligible. *Alice*, 134 S. Ct. at 2354 (*quoting Gottschalk v. Benson*, 409 U.S. 63 (1972)); *see also McRO, Inc. v. Sega of Am., Inc.*, No. CV 12-10327-GW (FFMx), 2014 WL 4749601 at *7 (C.D. Cal. Sept. 22, 2014) ("[W]e must be wary of facile arguments that a patent preempts all applications of an idea. It may often be easier for an infringer to argue that a patent fails § 101 than to figure out a different way to implement an idea, especially a way that is less complicated.") (internal quotation marks omitted).

Finally, "dismissal is appropriate solely when the only plausible reading of the patent is that there is clear and convincing evidence of ineligibility." *Card Verification Solutions, LLC v. Citigroup Inc.*, No. 13 C 6339, 2014 WL 4922524, *2 (N.D. Ill. Sept. 29, 2014) (*citing Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1339 (Fed. Cir. 2013), *vacated on other grounds by Wildtangent, Inc. v. Ultramerical, LLC*, 134 S. Ct. 2870 (2014)). If a plausible claim reading is patent eligible, then a Rule 12 motion to dismiss must be denied. *Id.* at *5 (denying a Rule 12(b)(6) motion to dismiss because "when viewing the patent in the light most favorable to [patentee], it ***plausibly*** recites a patent-eligible application of the abstract idea of verifying a

transaction.") (emphasis added).  If the facts at issue in a § 101 analysis are disputed, dismissal under Rule 12 is not appropriate.  *See, e.g., Colon Health Centers of America, LLC, v. HAzel, et al.*, 733 F.3d 535, 546 (4th Cit. 2013); *Versata Software, Inc. v.Sun Microsystems, Inc.*, No. 2-06-CV-358, 2009 WL 1084412, at *1.

### E.      Claim 17's Automated Digital Image Administration Is Not Abstract. [6]

The purpose of the claimed '295 invention is to automate the administration of digital images sent from a telephone to a server using the back end of the system (*e.g.*, the server) for automated analysis, organization, and storage, *i.e.*, "to implement an automated archiving of digital images in the server."  Ex. 1, at 2:60-61.  This purpose is achieved by creation and use of a system including a particular telephone unit that can capture digital images, associate user prescribed classification information, and transmit the digital images and classification information to a novel intelligent server that receives and analyzes digital image and classification information data and then stores the digital images taking into consideration the classification information.  *Id*. at 51-65.  Such an intelligent server (*i.e.*, an automated system with dual analysis and storage functionality) is necessary to achieve the purpose because the archiving and storage of the digital images in the server is not automated unless the server also analyzes the digital images and associated classification information, and stores the digital images taking into consideration the classification information.

Similarly, a telephone unit that can capture digital images, associate user prescribed classification information, and transmit the digital images and classification information to an intelligent server for automated storage is needed so that the user only has to use a single front end system.  The back end storage will be automated and organized due to the classification information entered on the front end.  The claimed method and use of the particular telephone

---

[6] Defendants brief does not substantively argue any other claims are patent ineligible under § 101 and therefore fails to meet their burden for invalidating any other claims.  *Microsoft Corp v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2243 (2011); *Genetic Techs. Ltd. v. Agilent Techs., Inc.*, No. CV 12-01616 RS, 2014 WL 941354, *2 (N.D. Cal. Mar. 7, 2014).

unit and intelligent server taught to automatically archive digital images sent from a telephone were not fundamental longstanding practices. Indeed, they did not previously exist at all.

Prior to the '295 Patent there is no history, let alone a longstanding practice, of using a single system (*i.e.*, the claimed intelligent server) to both analyze image information and store the images in an automated manner. The inventive nature of the '295 patent is even more pronounced in the context of the actual claimed invention, which is limited to telephones transmitting digital images to servers. The automated archiving of images achieved by the patented invention did not previously exist. This is true even when setting aside specific claim limitations such as a telephone, digital images, user prescribed classification information, and a server. There was no photo album (electronic or not) that could receive images and classification information and then both analyze the classification information and store the images in itself taking into consideration the classification information, all in an automated manner. Read in the light most favorable to TLI, the purpose of Claim 17 is far from abstract, and is squarely directed to patentable subject matter. *Card Verification Solutions*, 2014 WL 4922524, at \*5; *see also* Ex. 8, at 11 (*Ameranth, Inc. v. Genesis Gaming Solutions, Inc.*, Case No. 8:11-cv-00189-AG-RNB (C.D. Cal. Nov. 12, 2014) (Denying Defendants' invalidity summary judgment motion under § 101)). ("[A]utomation of manual tasks is not necessarily abstract. U.S. Patent No. 72 (1794) to Eli Whitney for a cotton gin is one familiar example of a solidly tangible automating machine.")

**F.     Claim 17 is Not Directed to a Mathematical Relationship, Natural Law, or Fundamental Long Prevalent Practice.**

Claims found abstract by the Supreme Court have been directed to basic tools of research and development, such as a fundamental mathematical relationship or a natural law, or claims that stood for a fundamental practice with a long history. *See, e.g., Benson,* 409 U.S. at 71-72; *Mayo*, 132 S. Ct. at 1296-98; and *Bilski*, 561 U.S. at 611-12 (invalidating claims covering the concept of hedging, "a fundamental economic practice long prevalent in our system of commerce"). Claim 17 is none of these things. Rather, the '295 Patent claims a system and

method for administering images sent from a telephone to a server that achieves "an automated archiving of digital images at the server," based on the information input at the telephone and the operation of the server, that in addition to a receiving unit and memory, also includes an "analysis unit [that] provides the administering function" of extracting and analyzing user prescribed classification information and storing the digital images in the server memory taking into consideration the classification information. Ex. 1 at 2:51-65, 5:47-48. There is no longstanding practice comparable to the technological development claimed in the '295 Patent.

Defendants' failed attempt to contrive an analogous longstanding practice in their Jane and Bob scenario reinforces this. (*See* D.I. 87 at 3, 24-25.) In this scenario, Jane takes photos on a camera phone, prints the images and writes classification information on them, mails the photos with the classification information to Bob, and Bob uses the classification information to store the photos in different sections of a photo album based on the classification information. *Id*. This is a nice hypothetical, but it fails to capture fundamental inventive limitations and benefits of the '295 Patent. The Jane and Bob scenario lacks a telephone that records digital images, allocates classification information, and transmits the digital images and classification information to storage system where they can be automatically archived. It also lacks a single unit or system comparable to the claimed intelligent server, *i.e.*, a single unit or system that receives photos and classification information, extracts the classification information, and stores within itself the photos taking into consideration the classification information.

The Jane and Bob scenario takes the role of the intelligent server of the '295 Patent and divides it among Bob (extraction and analysis) and a separate and distinct photo album (storage) that are not both parts of the same entity. The scenario also lacks the automated image archiving provided by the claimed server, because a person (Bob) is needed to perform the extraction and analysis of classification information. That a "simple, fast and surveyable archiving of the digital images is ***automatically*** carried out" is a substantial benefit of invention. Ex.1 at 2:63-65

(emphasis added); *see also id.* at 2:55-61 (the operation of the server's analysis unit to extract and analyze the classification information and use the classification information to "store[] the digital images in such a way that they can be easily relocated" makes it "possible to implement an ***automated archiving*** of digital images in the server.") (emphasis added).

According to Defendants' arguments, AT&T's patents on its telegraph and telephone systems would all be unenforceable because, prior to these systems, people could simply talk to each other in person, or write a letter or record their voice on a tape.  Or patents on digital cameras are all abstract because landscape and portrait artists created hand-drawn depictions of the same thing.  It is a fiction that such patents preempted anything that was done previously. *See Caltech*, at 29 (explaining that the "mental steps" and "pencil and paper" analysis for abstractness are "unhelpful for computer inventions" because "[m]any inventions could be theorized with pencil and paper, but pencil and paper can rarely produce the actual effect of the inventions").  Such inventions advanced the art.

Any suggestion that storing printed photos demonstrates the abstract nature of the '295 Patent claims is unpersuasive because it "does not tie adequately the claim language to the purported abstract concept."  *See PNC Bank, Nat'l Ass'n v. Secure Axcess, LLC*, Case CBM2014-00100 (U.S. Patent & Trademark Ofc., Patent Trial & Appeal Bd. Sept. 9, 2014), at 20-21 (method to identify and verify an electronic file not analogous to placing a stamp or seal on a paper document because "the claim does not recite a paper document" and  petitioner did not prove "that the placing of a trusted seal or stamp on a document is 'a fundamental economic practice' or a 'building block of the modern economy.'") (*citing Alice*, 134 S. Ct. at 2356).

The '295 Patent claims storing "digital images" in a "server," not storing print-outs of photos in a photo album.  Defendants fail to adequately tie the '295 Patent claim language to their purported abstract concept of putting a printed photo with classification information written on it in a photo album, and further fail to show that storing a printed photo in a photo album is "a

fundamental economic practice" or a "building block of the modern economy," like the concept of intermediate settlement at issue in *Alice*.  *See Alice*, 134 S. Ct. at 2356.

G.      **Claim 17 Does Not Preempt the "Building Blocks" of Technology.**

The '295 Patent's claims are plainly directed to automated archiving of digital images sent from a telephone at an intelligent server based on user prescribed classification information. The claims are designed to solve problems inherent and unique to archiving digital images captured at a telephone and sent to a server.  (Smith Dec. ¶¶ 29-30).  The claims do not preempt any building blocks of digital image storing, or any other technology.

Each claim requires a specially designed server that is not a generic conventional passive storage system, which may be considered a building block of technology.  Rather, it is a specific intelligent server that, after receiving the digital images and classification information, extracts the classification information and stores the digital images taking into consideration the classification information, in order "to implement an automated archiving of digital images in the server." Ex. 1, at 2:55-65.

The only activity preempted by the patent is the use of the claimed intelligent server to receive digital images and user prescribed classification information sent from telephones, extract and analyze that classification information, and store the digital images taking into consideration the classification information.  The specific intelligent server claimed is not a building block of technology and its claimed use did not exist prior to the '295 Patent.  Without using such a server, a system for storing digital images is not preempted.

H.      **Defendants' Claims of Preemption are False.**

Defendants characterize the '295 Patent as broadly claiming "an abstract idea for organizing digital images, *i.e.*, storing digital images based on 'classification information.'"  (D.I. 87 at 16).  Defendants claim that the patent seeks "to monopolize a basic process for *organizing* pictures sent from a phone to a server."  (D.I. 87 at 17) (emphasis in original).  Defendants assert

that Claim 17 is merely directed to "storing digital images taken using a telephone unit (*e.g.*, a camera phone) on a server (*i.e.*, a storage device) based on classification information provided by a user." (D.I. 87 at 22). These statements all ignore key claim limitations. Reviewing the invention as actually claimed proves Defendants' statements to be false.

There are many ways of "storing digital images taken using a telephone unit (*e.g.*, a camera phone) on a server (*i.e.*, a storage device) based on classification information provided by a user," (*i.e.*, Defendants' characterization of the invention) without infringing Claim 17. One distinction is hinted at in Defendants' misunderstanding of the claimed server as a mere passive "storage device." The intelligent server claimed in the '295 Patent is not a mere "storage device." Rather, it includes "an analysis unit for analyzing the data [sent by the telephone unit] with respect to the classification information which characterize the digital images." Ex. 1, at 2:16-18, *see also id.* at 2:55-59.

It would not infringe for a user to capture digital images on something other than a telephone unit. Nor would it infringe if a user did not provide classification information. It would not infringe if a user did not transmit digital images to a server. Nor would it infringe if the digital images were stored somewhere other than the server, or if the server stored digital images without considering user prescribed classification information. And it would not infringe to store digital images on a server that were not transmitted from a telephone. Indeed, Defendants argue elsewhere in their motion that TLI's complaint must be dismissed because no defendant infringes any of the narrow patent claims. *See* D.I. 87 at 38-42.

Defendants' hypothetical where Bob now sits at a computer and manually stores digital images based on classification information, (s*ee* D.I. 87 at 25), is also not preempted by the claims and does not infringe. This scenario fails to support Defendants' argument that the '295 Patent is abstract and instead underscores the inventive nature of the '295 Patent, that the scope of preemption is very limited, and the patent eligible subject matter of the invention. Putting

Bob at a computer manually storing digital images fails to address at least two aspects of the claimed invention.  First, nothing replaces the claimed intelligent server.  The entity doing the extraction and analysis of the classification information (Bob) and the entity storing the images (photo album) are separate and distinct entities that are not part of a single system, unlike the '295 Patent, where both the analysis unit (which extracts and analyzes the classification information) and the memory (which stores the images) are components of the server.

Second, having Bob "*manually* store digital images on a computer based on classification information," (D.I. 87 at 25), fails to achieve the benefit realized by the claimed invention of a "simple, fast and surveyable archiving of the digital images [that] is *automatically* carried out," Ex. 1, at 2:63-65 (emphasis added), and does not "implement an *automated archiving* of digital images in the server."  *See id.* at 2:55-61 (emphasis added).  In fact, this defeats the inventive concept.  No one would be interested in purchasing or using a camera phone if they were required to remove the storage module from the phone, insert it into a computer, and then manually transfer and store the images onto a computer.  This is exactly what was distinguished during the original prosecution.  *See* Patent Applicant Amendment "B," at 4-5.

Contrary to Defendants' claim, "automation of manual tasks is not necessarily abstract." *See Ameranth*, at 11 (citing "U.S. Patent No. 72 (1794) to Eli Whitney for a cotton gin" as "one familiar example of a solidly tangible automating machine."); *see also Caltech*, at 29 ("mental steps" and "pencil and paper" analysis for abstractness are "unhelpful for computer inventions").  Moreover, the '295 Patent invented the task, which is to capture classification information on a phone, transmit that information to a server system with a digital image, and use that classification information to automatically store digital images.  This was not done before the '295 Patent and was why the invention won an invention award at one of the world's largest companies and made the television news.

Contrary to Defendants' assertions, the '295 Patent claims do not preempt the use of camera phones, digital images, classification information, transmission systems, or servers for "organizing pictures sent from a phone to a server." (D.I. 87 at 17.) Those elements all remain available for public use to organize pictures sent from a phone to a server. The patented invention is only implicated when, on the front end, a user records digital images and associates classification information with the images at a telephone unit and then transmits the digital images and classification information to a specific back end, *i.e.*, the novel intelligent server claimed, which receives digital images and user prescribed classification information sent from the phone, extracts and analyzes the classification information in an analysis unit, and automatically stores the digital images taking into consideration the classification information.

## I.      Defendants' Cases Highlight the Patent Eligibility of Claim 17.

Defendants' reliance on *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.,* 758 F.3d 1344 (Fed. Cir. 2014), is misplaced. The distinctions between the *Digitech* claims and '295 Patent claims emphasize the patent eligible nature of the present invention. The *Digitech* claims were directed to a "device profile" and a "method for generating a device profile." *See Digitech*, 758 F.3d at 1349, 1351. The "device profile" was "comprised of two sets of data that describe a device" but were "not directed to any tangible embodiment of this information (*i.e.*, in physical memory or other medium)" and did not "claim any tangible part of the digital processing system." *Id*. at 1349. "The claims are instead directed to information in its non-tangible form," and were patent ineligible. *Id.* Similarly, the "method for generating a device profile" covered an "abstract idea because it describes a process of organizing mathematical correlation and is not tied to a specific structure or machine." *Id*. at 1350. The method claim "thus recites an ineligible abstract process of gathering and combining data that does not require input from a physical device," and is "so abstract and sweeping as to cover any and all uses of a device profile." *Id*. at 1351 ("[N]othing in the claim language expressly ties the method to an image

processor.  The claim generically recites a process of combining two data sets into a device profile; it does not claim the processor's use of that profile in capturing, transforming, or rendering of a digital image.").  The Federal Circuit found the *Digitech* claims covered an unpatentable abstract idea that "describes a process of organizing information through mathematical correlations and is not tied to a specific structure or machine."  *Id.*  at 1340.

To use '295 Patent language, *Digitech* is analogous to a hypothetical patent that merely claimed "classification information" or a "method for generating classification information" without reciting any structure or device, and thus covering any and all uses of "classification information."  In stark contrast, here the '295 Patent claims not just "classification information," but a specific structure and devices, namely a telephone unit (which itself has explicitly claimed sub-components), and which creates the classification information, a transmission system which transmits the classification information, and a server with a receiving unit, analysis unit, and memory.  Notably, the server claimed in the '295 Patent is not merely a generic general purpose server without further limitations.  Rather, it is a novel intelligent server with an analysis unit that extracts the classification information and automatically stores the associated digital images taking into consideration that classification information, thereby "implement[ing] an automated archiving of digital images in the server" that is "simple, fast, and surveyable."  '295 Patent, 2:55-65.  The '295 Patent claims are further limited in that the classification information must be user prescribed and sent from a telephone unit able to capture digital images and associate classification information, which was not generic or general purpose at the time of the invention.

Far from covering "any and all uses" of classification information, the '295 Patent's claims only cover the specific use of classification information where a user prescribes classification information to digital images that are transmitted to a server from a telephone and the server automatically archives the digital images at the server taking into consideration the classification information that is extracted by the analysis unit at the server.  Accordingly, the

27

'295 Patent claims are radically different from the *Digitech* claims that covered any and all uses of a device profile and did not recite any specific structure or machine.

The *Cyberfone* decision also does not help Defendants' argument.  Distinctions between the *Cyberfone* claims related to "a method and system for capturing and storing data," and the '295 Patent's claims again highlight the patent eligible nature of the present invention.  *See Cyberfone Sys., LLC v. CNN Interactive Group, Inc.*, 558 F.App'x 988, 990-92 (Fed. Cir. 2014) (upholding the district court's invalidity ruling, because "the well-known concept of categorical data storage, *i.e.*, the idea of collecting information in classified form, then separating and transmitting that information according to its classification, is an abstract idea that is not patent-eligible").

Cyberfone failed to save its method claim by arguing that it "requires a 'telephone,' and that it is a specific machine that plays an integral role in the method."  *Id*. at 992.  While the Federal Circuit recognized that "a process is patent-eligible if it is tied to a particular machine or apparatus" it also noted that for "a machine to impose a meaningful limit . . . it must play a significant part in permitting the claimed method to be performed."  *Id*.  (internal citations and quotation marks omitted).  The Federal Circuit found that the telephone recited in *Cyberfone* "is not a specific machine, and adds nothing of significance to the claimed abstract idea," so the telephone did not confer patent eligibility on the claim.  *Id*. at 993.

A paramount distinction between the *Cyberfone* claims and the '295 Patent's claims is the absence of any claim element in *Cyberfone* comparable to the intelligent server claimed in the '295 Patent.  Unlike the telephone in *Cyberfone* that added nothing of significance to the claimed abstract idea, the particular server claimed in the '295 Patent "play[s] a significant part in permitting the claimed method to be performed" and therefore "impose[s] a meaningful limit" on the claims.  *SiRF Tech. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1333 (Fed. Cir. 2010).

The '295 Patent server performs the automatic archiving of digital images based on classification information that is central to the invention's purpose of providing a "simple, fast

and surveyable archiving of the digital images [that is] automatically carried out." Ex. 1, at 2:55-65.  The server accomplishes this by extracting classification information from the received data and storing the digital images taking into consideration their classification information. Accordingly, Claim 17 passes the machine or transformation test due to the particular claimed server that plays a significant part in the claimed method and imposes a meaningful limitation. In contrast, the *Cyberfone* patent failed the machine or transformation test because its telephone adding nothing of significance.  *Cyberfone*, 558 F.App'x at 992-93.

Comparing the claims and invention in *Wolf v. Capstone Photography, Inc.*, No. 2:13-CV-09573 (C.D. Cal. Oct. 28, 2014), with those of the '295 Patent fails to support Defendants' argument.  Any superficial similarity between certain claim elements in *Wolf* and the '295 Patent fades away when the claims and inventions are considered as a whole.  The *Wolf* claims are merely "directed to the abstract idea of providing event photographs organized by participant, as applied using the internet." *Wolf*, slip. op. at 17.  The patents in *Wolf* are rooted in the longstanding conventional process of taking a photo of a sporting event participant (a player), identifying the player by a numbered bib worn by the player, and mailing a thumbnail of the photo and an order form to the player so the player can purchase a larger version of the photo if desired.  *Wolf*, slip. op. at 3.  The *Wolf* patents add nothing meaningful to this process, and merely implement the same conventional process using general purpose computer technology. *Id*. at 18, 21 ("The most specific piece of technology recited in the claims in still generic.")

As with the *Digitech* and *Cyberfone* claims, *Wolf* merely recites conventional practices and fails to claim any particular machine or apparatus that plays a significant part in performing the claimed invention.  The patents in *Wolf* add nothing new to the process of providing event photographs organized by participant, and instead merely implement the same existing process with computers and on the Internet.  The '295 Patent, in contrast, fundamentally alters and improves the process of administering digital images by providing a specific intelligent server

with an analysis unit that extracts classification information and automatically stores digital images taking into consideration that classification information, achieving an "automatic archiving of digital images in the server." '295 Patent, 2:55-65.  In other words, the '295 Patent enabled the automated archiving of digital images at a server, using classification information prescribed by a user on telephone.  This created the ability for many users to store and readily retrieve many digital images from a server.  The *Wolf* patent came after the longstanding practice of people taking pictures of athletes and, based on their bib number, sending diminished quality images to the athlete and asking the athletes if they wanted to purchase high quality images.

### J.  Claim 17 Includes Meaningful Limitations and Inventive Concepts.

As shown above, Claim 17 is not abstract, but rather claims a particular method for automated archiving of digital images at an intelligent server based on user prescribed classification information sent from a telephone with the digital images.  But even if, as Defendants contend, Claim 17 merely "covers an abstract idea for organizing stored pictures," which it does not, Claim 17 adds meaningful limitations that represent inventive concepts, notably a specific novel intelligent server not found in the prior art.  Accordingly, Claim 17 meets the requirements for patentable subject matter under the second prong of the § 101 test.

As addressed above, the '295 Patent invented an automated archiving system for digital images sent from a telephone in which an intelligent server receives the digital images and user prescribed classification information at a receiving unit in the server, extracts and analyzes the classification information at an analysis unit in the server, and stores the digital images in a memory in the server taking into consideration the classification information.  Ex. 1 at 2:5-65. Having a system (*e.g.*, the claimed server) extract and analyze classification information and then store images in itself based on that classification information represents a meaningful limitation that represents an inventive concept.  Defendants and the Patent Office have been unable to identify the prior existence of such a server.  It is this novel server that makes it possible for the

invention to achieve its goals of "implement[ing] an automated archiving of digital images in the server" and providing "a simple, fast and surveyable archiving of the digital images [that] is automatically carried out." *Id.* at 2:60-65.

Defendants compose fiction when writing "at most, the claims add conventional computer elements such as a 'telephone unit' and 'server' that the patentee concedes and the PTAB confirmed were known in the prior art." (D.I. 87 at 17.)  In reality, the PTAB and original Patent Examiner distinguished prior art based upon the claimed server and thus found this claim element to be anything but a "conventional computer element." *See* Ex. 4 at TLI0000193-94; and (D.I. 47-1, at 16-17).  If, as Defendants suggest, the claimed server was actually a "conventional computer element[] . . . well known in the prior art" (D.I. 87 at 17), then perhaps defendant Facebook would have had more success actually identifying such a claimed server in the prior art.  *See* (D.I. 47-1, at 16-17 ("[Facebook] has not established that Witek teaches the 'storing the digital images in the server, said step of storing taking into consideration the classification information' limitation recited in claim 17.").  The PTAB further noted that the ability of the Witek system to "permanently store received faxes does not demonstrate that the Witek system stores digital images in the server, taking into consideration the classification information, as required by claim 17." *Id.*  Facebook's IPR petition was denied in part because of Facebook's inability to identify a server or similar system in the prior art that practiced the Claim 17 server limitations.  Presumably, a company with Facebook's resources and technical knowhow could have identified prior art that teaches "a conventional computer element."  But Facebook failed to do so precisely because the intelligent server claimed in the '295 Patent is not a conventional computer element.

## K. Claim 17 Passes the "Machine or Transformation" Test.

While not a patentable eligibility prerequisite, the "machine or transformation" test is a "useful and important clue to patentability." *See Bilski*, 130 S. Ct. at 3221.  Under the test, a

process is patentable under § 101 if it is "tied to a particular machine or apparatus" or "transforms a particular article into a different state or thing." *SiRF Tech.*, 601 F.3d at 1332 (internal quotations omitted).  For "a machine to impose a meaningful limit . . . it must play a significant part in permitting the claimed method to be performed." *Id.* at 1333.  Claim 17 passes the test under the machine prong because it is tied to a particular intelligent server.  As explained above in distinguishing the *Cyberfone* decision (*see supra* at pp. 28-29), the specific claimed server performs the automatic archiving of digital images based on classification information central to the invention's purpose.  Ex. 1, at 2:55-65.  To accomplish this, the server's analysis unit extracts and analyzes classification information and stores the digital images at the server taking into consideration the classification information.  *Id.* at 2:15-18; *see also id.* at 2:55-59; *id.* at 5:47.  The claimed server is therefore a particular machine or apparatus that plays a significant part in permitting the claimed method to be performed.

## III.    TLI's ALLEGATIONS ARE MORE THAN PLAUSIBLE

TLI's complaints are straightforward, with detailed allegations of direct infringement by all Defendants and end users, and indirect infringement by Defendants that induce end users to use claimed systems.  Each complaint alleges that: (i) a ***single actor*** – each defendant and each end user – uses the claimed invention (direct infringement); and (ii) certain defendants actively induce and contribute to their end user's direct infringement (both indirect infringements).  Defendants attempt to confuse these issues and morph the complaints into ones alleging joint infringement by multiple parties, arguing at length that these "allegations" of joint infringement are insufficient, but their entire argument fails because TLI does not allege joint infringement.

As the Federal Circuit recently held, it must first be determined whether the plaintiff alleged a single actor infringement theory; if so, joint infringement is irrelevant.  *See Tech. Patents LLC v. T-Mobile (UK) Ltd.*, 700 F.3d 482, 501 (Fed. Cir. 2012) (The claims "do not present an

issue of joint or divided infringement [because they] do not require performance by multiple actors . . . and [the] claim charts for each of the listed claims do not require multiple actors.")[7]

To arrive at their incorrect conclusion, Defendants invent a new, heightened infringement standard for infringing "use." They allege "use" requires ownership and physical control of the device used. But the Federal Circuit has repeatedly rejected this exact argument, holding use is putting something into service and can be someone simply transmitting a message through a network, even though that person does not own or control the network or network devices. *See, e.g., NTP, Inc. v. Research in Motion, Ltd.,* 418 F.3d at 1282, 1316-1317 (Fed. Cir. 2005), *abrogated on other grounds*, *Zoltek Corp. v. U.S.*, 672 F.3d 1309 (Fed. Cir. 2012); *Centillion Data Sys., LLC v. Qwest Comms. Int'l, Inc.*, 631 F.3d 1279, 1284 (Fed. Cir. 2011). Transmitting the message put the systems into service. Who owns or controls the device used is irrelevant.

## A.      Factual Background

### 1.   The Patent Claims

The patent claims are all system-type claims that require a system comprising a telephone with a camera for taking a digital image and inputting classification information regarding the digital image. The classification information and digital image are transmitted to a server, which stores the digital image according to the classification information. This allows smartphone users to (i) easily offload digital images from the smartphone (where memory is limited), (ii) to a remote server (where memory is abundant), and (iii) and to store those images in a manner according to the classification information, which makes them readily accessible.

---

[7] The *Tech. Patents* Court was specifically referring to its joint infringement decisions in *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373 (Fed. Cir. 2007), *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318 (Fed. Cir. 2008), and *Akamai Tech., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301 (Fed. Cir. 2012) (later overruled *Limelight Networks, Inc. v. Akamai Tech., Inc.*, 134 S.Ct. 2111 (2014)) as being not relevant to single actor direct infringement. Indeed, in each of those cases, the parties agreed that multiple persons were required to infringe the asserted claims and joint infringement was the only issue. *See Muniauction*, 532 F.3d at 1328; *BMC*, 498 F.3d at 1378; *Akamai Tech.*, 692 F.3d at 1305; *Limelight Networks*, 134 S.Ct. at 2120.

## 2. The Defendants

There are two categories of defendants: (i) Platform Defendants and (ii) User Defendants. Platform Defendants provide the infringing structure to the public, including storage servers and image-uploading software that is pre-installed or can be installed on smartphones. Several Platform Defendants provide smartphones as well. The Platform Defendants encourage users to use the infringing structure they provide to take digital images on their phones and to upload and store those digital images on the Platform Defendants' servers. They design these platforms for public use, so that anyone can sign up and share information (including digital images), with friends, family or the public. When users visit Platform Defendant web sites, Platform Defendants earn revenue from advertising and/or by selling goods to the users. The Platform Defendants also induce and contribute to infringement when others use their platforms. User Defendants use the infringing platforms provided by the Platform Defendants (who are also User Defendants by using their own platforms (*e.g.*, for testing and marketing)).

### B.   TLI's Direct Infringement Allegations Are Plausible and Well Pled

### 1. Platform Defendants Directly Infringe as Single Actors

Direct infringement here primarily involves "use" of the claimed inventions. *See* 35 U.S.C. § 271(a) ("whoever without authority makes, uses, offers to sell, or sells any patented invention . . . infringes the patent"). A person uses a claimed system when that person "put[s the infringing system] into action or service" because a system is used as a whole, "in which the components are used collectively, not individually." *See, e.g., NTP*, 418 F.3d at 1316-18; *Centillion*, 631 F.3d at 1284. Thus, a person who transmits a message through a network used the network because that person put the network into service -- even if that person does not directly possess the network devices. *See id.*

As an example of an infringing use, most smartphones are preloaded with image-uploading software provided by Platform Defendants, e.g., Facebook's software. Facebook created this software to allow smartphone users to easily capture, characterize and upload digital

images to Facebook's servers.  A smartphone user (*e.g.*, a User Defendant) uses Facebook's software, following Facebook's easy-to-use instructions, to capture a digital image and upload it to Facebook's servers at Facebook.com.  When a user uploads a digital image the Platform Defendant's servers operate automatically, according to their natural and intended purpose, to receive that digital image and store it on the user's behalf according to that user's classification information.  As alleged in the complaints, and explained further below, under such circumstances these end users would directly infringe the apparatus claims because they put the claimed systems into service, and they would directly infringe the asserted method claims because they use and practice the claimed steps.

In addition, Platform Defendants' platforms are designed to take over smartphone functionality.  In such situations, Platform Defendants' platforms automatically record, retrieve and upload digital images from a smartphone.   As alleged in the Complaints, and as explained further below, under such circumstances the Platform Defendants directly infringe the apparatus claims because they put the claimed systems into service, and directly infringe the method claims because they use and practice the claimed steps.

Turning to Defendant's motion, Defendants move to "dismiss the bulk of Plaintiff's direct infringement claims against the Platform Defendants," (D.I. 87 at 44) but in doing so concede at least some of TLI's direct infringement claims against Platform Defendants are sufficient, thus ending the inquiry.  If any ***one*** of TLI's direct infringement claims against Platform Defendants is sufficient (as Defendants concede), TLI's direct infringement claim stands.  *See* Fed. R. Civ. P. 8(d)(2) (A party may "set out 2 or more statements of a claim [] alternatively . . . If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient."); *Peterson v. McGladrey & Pullen, LLP*, 676 F.3d 594, 597 (7th Cir. 2012) ("[T]he pleading is sufficient if *either* allegation is sufficient.").

Every Complaint alleges jurisdiction and TLI's ownership of the patent. *See, e.g.,* "Google Complaint" at ¶¶ 5-14.  Every Complaint alleges that each Platform Defendant is directly infringing. *See, e.g., id.* at ¶ 30.  Every complaint includes a section that describes "[Defendant's] Infringing Products." *See, e.g., id.* at ¶¶ 21-28.  Every Complaint informs each Platform Defendant of the patent and demands damages. *See, e.g., id.* at ¶¶ 21-24, 29-37, 48-50, Prayer for Relief.  TLI's direct infringement allegations against Platform Defendants thus are plausible and exceed all pleading requirements. *See K-Tech Telecomms., Inc. v. Time Warner Cable, Inc.*, 714 F.3d 1277, 1282-83 (Fed. Cir. 2013).

Every Complaint also sets forth alternative theories of Platform Defendants' direct infringement, for example, alleging direct infringement includes their own use of the claimed systems and methods via "testing." *See, e.g* Google Complaint at ¶ 31 ("[Platform Defendant]'s direct infringement includes . . . its testing of [its] products by uploading images from mobile devices having telephones onto [its] servers.")  Such use is direct infringement. *See, e.g., Vita-Mix Corp. v. Basic Holding, Inc.,* 581 F.3d 1317, 1325-26 (Fed. Cir. 2009) (internal testing was direct infringement); *Nielsen*, 819 F. Supp. 2d at 595-96 (allegations directed to in-house testing alone are sufficient); *Exelis Inc. v. Cellco P'ship*, No. 09-190-LPS, WL 528909, *3 (D. Del. Oct. 9, 2012) (alleging defendants use their devices on networks in violation of the patent, including during testing, is sufficient under *Centillion* for direct infringement of a system claim.) Tellingly, Defendants fail to mention TLI's testing allegations or the controlling *K-Tech* case. Because TLI's testing direct infringement allegations are sufficient, the motion must be denied.

TLI's Complaints also contain additional alternative theories of Platform Defendants' direct infringement as a single actor, each setting forth more than a plausible direct infringement allegation.  For example, TLI alleges that Platform Defendants' image uploading software is preloaded on many smartphones and smartphone users can upload images directly via a Platform Defendant's website. *See, e.g*., Google Complaint at ¶¶ 23, 32.  As a result, no user has to

36

download or install software in order to upload images to a Platform Defendant's servers, and thus Platform Defendants put the claimed systems into service, a directly infringing use. *See, e.g., Rembrandt Social Media, LP v. Facebook, Inc.*, 950 F. Supp. 2d. 876, 885 (E.D. Va. 2013) ("[A] result different from *Centillion* must obtain here because the complaint alleges that defendants (i) place into use each element of the system . . . ."); *Soverain Software LLC v. J.C. Penney Corp.*, 899 F. Supp. 2d. 574, 581 (E.D. Tex. 2012) ("[T]he delivery of Defendants' web page itself provides the programming required by the claims; the user is not required to install anything [as they were in *Centillion,* where they had to download and install the software, and thus] . . . Defendants use the system under § 271(a) by putting the system into service . . . .")

TLI's Complaint also allege that Platform Defendants automatically upload images from mobile telephones without user input, putting claim 1's system into service. *See, e.g*., Google Complaint at ¶ 32.  In such situations, Platform Defendants are direct infringers because they themselves place the claimed system into service. *See, e.g., Rembrandt*, 950 F. Supp. 2d at 885; *NTP*, 418 F.3d at 1316-17 (a person uses a claimed system by putting the system into service); *Centillion*, 631 F.3d at 1284 (same).

TLI's Complaints also allege that the Platform Defendants sufficiently control their user's and agent's operations, which would render the Platform Defendants direct infringers. *See, e.g*., Google Complaint at ¶ 31 ("[Platform Defendant] also directs and/or controls its employees, executives, customers and agents to use the aforementioned digital uploading platforms . . . .")  *See Nielsen*, 819 F. Supp. 2d at 596 ("[A]n independent contractor software company hired by defendant to conduct testing of defendant's allegedly infringing software" is a category of infringer that might render "defendant vicariously liable for such [] actions.")

TLI's Complaints also that "[Platform Defendant's direct] infringement includes . . . practicing the method of claim 17 and claims dependent thereon" and that "[Platform Defendant] directs and/or controls the practicing of all claim elements [of claim 17], as shown for example,

37

by . . . [Platform Defendant] automatically uploading digital images from mobile devices having telephones onto its server. . . .")  *See, e.g.*, Google Complaint at ¶¶ 30, 33.  This too is a direct infringement by Platform Defendants as a single actor.  Defendants, however, engage in premature claim construction, interpreting claim 17's "recording of images" to require that claim 17 "must be performed by a user of the telephone unit" (Mtn. at 31 (emphasis in original)).  Defendants are wrong -- claim 17 simply recites, "recording images using a digital pick up unit."  It does not require a user to perform this or any step.  Recording is performed by Platform Defendants' products when they automatically upload images, as alleged.  Moreover, Defendants misleadingly state that "TLI acknowledges" that "these steps [of claim 17] generally require the action of separate entities."  (Mtn. at 28).  To be clear, TLI did nothing of the sort.  Defendants build upon this false premise by adding that "TLI [] attempts to plug the holes in its claims of direct infringement of the system and apparatus claims through resort to joint infringement."  (Mtn. at 28-29)  But there are no holes in TLI's direct infringement claims, and joint infringement is irrelevant because TLI alleged a single actor.[8]

  All of these alternative direct infringement allegations against the Platform Defendants as a single actor are plausible, but any one of them would be sufficient to support TLI's direct infringement allegation.  *See* F. R. Civ. P. 8(d)(2).  Platform Defendants' entire methodology regarding TLI's direct infringement allegations is flawed.  Defendants ignore TLI's single actor theories and jump to joint infringement, ignoring the first step of the inquiry and the law on single actor direct infringement.  Next, Defendants rely entirely on isolated phrases from TLI's allegations, namely "contracts," "instructions" and "automatically." (Mtn. at 30-31).  Defendants conveniently ignore the majority of TLI's allegations, including testing, preloaded software, webpage access, automatic uploads, and agents -- all of which are direct infringements by a

---

[8] TLI's Complaints contain an allegation for joint infringement in a single paragraph (*e,g,* Google Complaint at ¶ 57), but this allegation is separate and distinct from all of the other allegations in the complaint, which are directed to direct infringement by a single actor, and the inducing and contributing to direct infringement by a single actor.

single actor.  Even if one were to consider only Defendants' chosen "contracts" and

"instructions" in a vacuum and in the joint infringement context, Defendants' motion must still

be denied because whether Defendants' actions and/or control regarding their customers rise to

the direct infringement level is a factual issue, "not a matter that can be disposed at this early

[pleading] stage."  *Nielsen*, 819 F. Supp. 2d at 596.

### 2.  Defendants' "Transmission System" Arguments are Not Credible

Defendants argue that TLI's complaints fail to mention a "transmission system" (which is

recited in claim 1) and that it somehow follows that "TLI's direct infringement allegations

against the Platform Defendants should [therefore] be dismissed." (D.I. 87 at 39-40.)  Even

though *K-Tech* does not require a complaint to set forth infringement allegations on a claim

element by claim element basis (*i.e.*, a claim chart), here again, TLI's complaints go far beyond

the requirements of *K-Tech* and meet even Defendants' improper, heightened standard.

Considering the exemplary Google Complaint, TLI mentions "upload" ***70 times***.  *See*

Google Complaint at ¶ 24 ("The infringing products include, but are not limited to, the products

and processes that [Platform Defendant] uses to capture, ***upload***, store and organize the digital

images it ***receives*** from mobile devices having telephones, including via [Platform Defendant].")

(emphasis added).  Defendants appear to be asking the Court to believe they can "upload" digital

images they "receive" from mobile telephones without using a transmission system, as if they

receive and upload such digital images magically, perhaps via telekinesis.  The accused

defendant servers are, of course, plainly and necessarily coupled to a transmission system.

Otherwise, the servers could never "receive" or "upload" digital images from smartphones.  *See*

*K-Tech*, 714 F.3d at 1286-87 ("The touchstones of an appropriate analysis under Form 18 are

notice and facial plausibility . . . . Here we find that [plaintiff's] complaint in both actions satisfy

these standards.  [Defendants] know what [plaintiff's] patents claim, and they know what

[plaintiff] asserts their systems do, and why.")  Defendants never suggest an alternative to their

servers "receiving" and "uploading" digital images via anything other than coupling to a transmission system, because they cannot.  If Defendants are truly confused (they are not) as to whether their servers are coupled to and use transmission systems -- and thus actually operate -- TLI has already served infringement claim charts that identify, claim element by claim element basis, such transmission systems.

Defendants also suggest TLI's direct infringement claims hinge on showing they have "supplied or controlled" a product or every claim element.  (D.I. 87 at 39; *id*. at 40 ("TLI must establish that a single Defendant controls the entire accused system.")  Infringement, however, involves the making, using, selling or offering for sale of a patented invention.  *See* 35 U.S.C. § 271(a) (supplying or controlling do not appear anywhere in the statute).  Defendants make up a new infringement standard from whole cloth (and then want to try the case at the pleading stage based on their new infringement standard).  Defendants refer to *Centillion* for support, but the *Centillion* Court found the exact opposite of what Defendants propose, finding that "control . . . is the ability to place the system as a whole into service" which can simply be the "transmitting of a message" through a network; importantly, the *Centillion* Court found that putting a system into service has nothing to do with "possession" or "physical control" of the devices in the system that are being used.  *Centillion*, 631 F.3d at 1284.  Put simply, whether Defendants "supplied," "provided" or physically controlled anything is irrelevant to the analysis.

### 3.  Users and the User Defendants Are Direct Infringers as Single Actors

TLI's direct infringement allegations against end users are detailed and straight forward. Here again, Defendants ignore TLI's single-actor, direct infringement allegations to attack joint infringement, which is irrelevant.  TLI's Complaints plainly allege that Platform Defendants' end users directly infringe the '295 Patent, alone, as a single actor:

> [User Defendant] captures digital images on mobile devices having telephones and it uploads those images to databases where those images are archive and stored, including to [Platform Defendant]'s databases.  Those images are uniquely identified and characterized by [User Defendant] . . . and can be easily accessed on the databases using

those identifiers and characterizations.  Such actions of uploading digital images from mobile devices having telephones infringe one or more claims of the '295 Patent.

Google Complaint at ¶ 26; *see also id.* at ¶¶ 8, 39 (end users directly infringe at least claims 1 and 17) , 52 (User Defendant directly infringes at least claims 1 and 17).  TLI's direct infringement allegations against Platform Defendant's users and customers go far beyond the *K-Tech* requirements.  But Defendants ignore TLI's single actor direct infringement allegations and insist TLI is arguing joint infringement, when it is not.  This joint infringement straw man forces them to engage in an unnecessary, confusing morass involving technical issues, claim construction, questions of fact, and joint infringement law.  The first and only necessary step, however, is to determine whether TLI raised a single actor infringement theory.  *See Tech. Patents*, 700 F.3d at 501 (decisions regarding joint or divided infringement "do[] not affect [the] analysis" because Plaintiff "raised a single-actor theory" and Plaintiff's "claim charts for each of the listed claims do not require multiple actors"); *Centillion*, 631 F.3d at 1285 ("[Defendant's] customer is a single 'user' of the system and because there is a single user, there is no need for the vicarious liability analysis from *BMC* or *Cross Medical*.")  TLI raised a single actor theory in its complaints and claim charts, making joint infringement and vicarious liability irrelevant.

Defendants nevertheless argue their users cannot infringe because they do not have physical control or ownership of Defendants' servers, but this argument was raised in *NTP* and rejected.  *See NTP*, 418 at 1317 ("RIM argues . . . [that its network] Relay [] controls the accused systems and is necessary for the other components of the system to function properly . . . [but w]hile this distinction recognizes the technical differences between [RIM's system and the system in *Decca*], it fails to appreciate the way in which the claimed NTP system is actually used by RIM's customers.")  Requiring a person to physically own, possess or control a device before being an infringing "user" would effectively read "use" out of § 271(a).  *See Centillion*, 631 F.3d at 1285 ("It makes no difference [here] that the back-end processing is physically possessed by [Defendant] Qwest [rather than Qwest's customers.]"); *Tech. Patents LLC*, 700 F.3d at 501

41

("Importantly, we noted that the user does not necessarily need to 'have physical control over' all elements of a system in order to 'use' a system.") (*citing Centillion*, 631 F.3d at 1284).

Put simply, the only "control" required for use is "the ability to place the system as a whole into service." *See Centillion*, 631 F.3d at 1285.[9] An infringing "use" is simply making something work for its intended purpose; putting it into service. *Id*. at 1284. *Beedle v. Bennett*, 122 U.S. 71, 78 (1887) (Although defendants did not make or sell the infringing well device, "[t]he use of a well so constructed is . . . a continuing infringement, as every time water is drawn from it the patented process is necessarily used"). Whether Defendants supplied, provided, or physically controlled anything is irrelevant.

TLI's complaints addressed and encompassed *Centillion*. *See e.g.,* Google Complaint at ¶ 39 ("[T]to the extent that claim 1 is construed to require a system with the system placed into service by a user who uploads digital images from a mobile device having a telephone (and it is determined that [Platform Defendant] does not direct and/or control that user), the user would be considered to be a direct infringer of claim 1. . . .") As a result, TLI's direct infringement allegations against Platform Defendants' users and customers are more than plausible.

---

[9] In *Centillion*, system claims involved "present[ing] information to a user," requiring back-end "data processing" for generating user requested reports, maintained and operated by defendant Qwest, and front-end "processing means" to perform processing on information returned by the back-end, maintained and operated by a user. *Centillion*, 631 F.3d at 1281. The Federal Circuit reversed the District Court's summary judgment of noninfringement:

> We hold that the on-demand operation is a 'use' of the system as a matter of law. The customer puts the system as a whole into service, i.e., controls the system and obtains benefit from it. The customer controls the system by creating a query and transmitting it to Qwest's back-end. The customer controls the system on a one request/one response basis. This query causes the back-end processing to act for its intended purpose to run a query and return a result. The user may then download the result and perform additional processing as required by the claim. If the user did not make the request, then the back-end processing would not be put into service. By causing the system as a whole to perform this processing and obtaining the benefit of the result, the customer has 'used' the system under § 271(a). It makes no difference that the back-end processing is physically possessed by Qwest.

*Centillion*, 631 F.3d at 1285.

42

TLI's complaints also addressed and encompassed *NTP*, which found end users "used" both system and method claims. "The asserted claims [in *NTP*] included both systems and methods for transmitting an email message between an originating processor [e.g., a RIM Blackberry handheld device] and a destination processor" utilizing an "interface" or "interface switch" that routed the messages. *NTP*, 418 F. 3d at 1314, 1318. The Federal Circuit found that RIM's end users used RIM's Blackberry system, including the RIM Relay interfaces, because the end users put the system into service in the United States. *Id*. at 1316-17. Once the end users pressed send, the rest of the system performed automatically, according to its intended, infringing purpose (*e.g*., to transmit an email message from one Blackberry to another through the RIM Relays). *See id.* ("When RIM's United States customers send and receive messages by manipulating the handheld devices in their possession in the United States, the location of the use of the communication system as whole occurs in the United States.") RIM physically possessed and operated its Relay interfaces, but the end users used the Relay interfaces to transmit and route email messages, which was an infringing use. *See id.* The *NTP* Court also found RIM's end users practiced the claimed methods, including the use of RIM's Relay interfaces. *See id.* at 1318. But since the user's use of the recited method step occurred in Canada, where the Relay interfaces were located, the Court held that there was no infringement within the United States. *See id.* ("[T]he asserted method claims . . . recite[] a step that utilizes an 'interface' or 'interface switch,' which is only satisfied by the use of RIM's Relay located in Canada. Therefore . . . these claimed methods could not be infringed by the use of RIM's systems.")

The same holds in the present case (except for extraterritoriality, which is not at issue here). Platform Defendants' end users and customers place the claimed system into use by originating a message and sending it through a network, and end users use the method claims by practicing the claimed steps and utilizing the claimed devices. It is irrelevant that Platform Defendants physically control or operate the servers (as in *Centillion, NTP* and *Tech. Patents*).

43

Platform Defendants make their servers available for anyone to use, and end users in fact use those servers for their natural and intended purpose.  Indeed, the success of Platform Defendants' business depends entirely upon the public's use of their servers.

All that is relevant is whether someone uses a device in an infringing manner or practices claimed steps, regardless of who owns or physically controls the device.  TLI alleges end users put the claimed system into use and thus use the system (direct infringement).  TLI also alleges end users use the claimed methods by performing the claimed steps (also direct infringement).

### C.    TLI's Contributory Infringement Allegations are Plausible and Well Pled

TLI's Complaints allege that each Platform Defendant contributes to their end user's direct infringement in detail.  Google Complaint at ¶ 45.  TLI's Complaints identified the infringing components at issue, namely Platform Defendants' "image uploading software" "provided to [] its customers" that is "for use in systems, [and] which facilitate the uploading of digital images from mobile devices having telephones."[10]  Google Complaint at ¶ 45.  TLI alleged this component is material to the invention (the '295 patent is directed to the uploading of digital images) and has no substantial non-infringing uses.  *Id*.  TLI also alleged Platform Defendants know these components are not staple items of commerce and are not suitable for non-infringing use, and Platform Defendants know that by providing these components to customers, that they infringe at least one patent claim.  These are the elements of contributory infringement.  *See* 35 U.S.C. § 271(c).

Defendants nevertheless claim TLI has an obligation to somehow identify substantial, non-infringing uses of Defendants' "accused products."  (D.I. 87 at 33-34.)  Even assuming Defendants meant accused "components" rather than products, Defendants' argument is

---

[10] Even though Defendants do not sell products and thus the accused instrumentalities in this case do not have traditional product names, TLI expressly identified Platform Defendants' "aforementioned image uploading platforms" by name, in the section captioned "[Platform Defendant's] Infringing Products," which include, for example, "Picasa," "Google+" and "YouTube" products.  *See* Google Complaint  at ¶ 21.

nonsensical and would require proof of a negative (*e.g.*, proof of no non-infringing uses).  *See Conair Corp. v. Jarden Corp.*, 13-cv-6702, 2014 WL 3955172, *4-*5 (S.D.N.Y. Aug. 12, 2014). Defendants' reliance on *In re Bill of Lading* is misplaced because the complaint there expressly identified substantial non-infringing uses, making it impossible for the component to have no such uses.  *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1339 (Fed. Cir. 2012) ("[T]he amended complaints actually ma[de] clear . . . that [defendant's] products [did] have substantial non-infringing uses.")  Here, TLI's Complaints expressly state that components at issue have no substantial non-infringing uses, and they fail to identify any non-infringing uses.  *See Bel Fuse v. Molex Inc.*, No. 13-2566 (JBS/JS), 2014 WL 2710956 at *7 and fn. 3 (D.N.J. June 16, 2014).

TLI sufficiently alleged all elements of contributory infringement, raising a more than plausible claim under § 271(c).  *See, e.g.*, *Nielsen*, 819 F. Supp. 2d at 602.

### D.    TLI's Inducing Infringement Allegations are Plausible and Well Pled

Inducing infringement first requires a direct infringement (a person must induce another person's direct infringement).  As discussed above, TLI's complaints plainly and unequivocally allege that Platform Defendants' end-users directly infringe the asserted claims at least via their use of the claimed systems and methods.  *Fujitsu Ltd. v. Belkin Int'l, Inc.*, 782 F.Supp.2d 868, 892 (N.D. Cal. 2011) ("[Plaintiff's] complaint alleges that these end-users used infringing devices . . . this is sufficient to plead direct infringement by end-users.")

Defendants argue TLI's method claim inducement allegations should be dismissed because "[TLI] does not allege a single direct infringer."  D.I. 87 at 34.  Not only do Defendants attempt to split TLI's inducement claim into pieces (apparatus and method), which is improper per FRCP 12(b)(6) ("failure to state a claim"), they are also wrong.  TLI's complaints *did* allege end users directly infringed the method claims.  *See, e.g.,* Google Complaint at ¶ 39 ("As another example, to the extent that [method] claim 17 is construed to require a method with steps

performed by one or more entities other than [Platform Defendant], *for example, a user* (and it is determined that [Platform Defendant] does not direct or control these entities), [Platform Defendant] induces those entities to perform those infringing acts. . . ."); ¶ 52 ("[User Defendant's] infringement includes, without limitation . . . (ii) practicing the method of claim 17 and claims dependent thereon.").

Furthermore, Defendants again insist that since the Platform Defendants operate the accused servers to store the digital images for and on behalf of their users, a user cannot "use" the server that the Platform Defendants make available for them to use. Defendants argue that direct infringement requires physical control of device being used, but as demonstrated *supra*, that is false. A person uses a device by placing it into service. This is akin to a person walking into an Acme phone booth, dropping a dime into the phone's slot, and using the Acme phone to make a call over the Acme network, and, if the recipient does not answer, perhaps leaving a voice message on an Acme voice mail box. The person used the system by placing the call. This put the system into use. It is irrelevant that the person does not own or physically control any aspect of the system. The system was created for the person to use, and the person used it for its natural and intended purpose. The person benefits from the use (was able to make a phone call), and Acme did as well (earned a dime). The infringement statute was drafted to capture the user (as a direct infringer) and Acme (as a potential inducer of the user's direct infringement).

It is no different here. Platform Defendants' provide platforms and software for anyone to use. Platform Defendants advertise their systems and entice users to use their platforms. Users use those platforms for their natural and intended purposes, which is an infringing use. Naming end-users as direct infringers effectively ends any divided infringement inquiry. *Nielsen*, 819 F. Supp. 2d at 600-01.

Defendants twist TLI's straightforward direct infringement allegations and attempt to construe TLI's patent claims to create a divided infringement case where none exists. *See*

46

*Fujitsu,* 782 F. Supp. 2d at 889-90 ("[Defendants] spend much of their [] brief making arguments about what the [] Patent's claims cover . . . at the motion to dismiss state . . . .  Claim construction and infringement analysis should not be resolved on a motion to dismiss.")

**E.      TLI'S § 271(f) Allegations are Plausible and Well Pled**

35 U.S.C. § 271(f) provides for infringement when a defendant exports a component of a patented invention for combination outside of the United States.  The § 271(f) language mirrors the language of § 271(b) (inducement) and § 271(c) (contributory) and *adds* infringement for supplying components of inventions from the United States to persons outside the United States for combination abroad.  TLI's Complaints allege inducement and contributory infringement in great detail and *added* to these allegations that "[Platform Defendant] is liable for infringement under 35 U.S.C. § 271(f) when the end user is outside the United States by supplying its software components for combination outside the United States."  Google Complaint at ¶ 46.

Nevertheless, Defendants choose a single paragraph from TLI's Complaints, and ask the Court to analyze the single paragraph in a vacuum, divorced from the preceding 45 paragraphs in the Complaint -- including the paragraphs that detailed TLI's allegations of induced and contributory infringement.  D.I. 87 at 42-43.  Defendants feign confusion as to what "software components" means, when TLI discussed the relevant software components in detail in the preceding paragraphs regarding contributory infringement.  *See, e.g*., Google Complaint at ¶ 44 ("[Platform Defendant] provides components, including . . . image uploading, pre-loaded software  . . . or downloadable applications, for use in systems, which facilitate the uploading of digital images from mobile devices having telephones. . . [and Platform Defendant] knows that by providing ***such components*** to its customers, its customers will infringe at least one claim of the '295 Patent. . . .") (emphasis added).  Defendants' § 271(f) argument rests entirely on their reading of a single paragraph in isolation and is simply not credible.[11]

---

[11] Defendants argue § 271(f) does not apply to method claims but TLI never said it did.  TLI's claim under § 271(f) pertains to the apparatus claims and is sufficiently pled.  Defendants'

### F.    Defendants' Knowledge and Specific Intent was Sufficiently Pled

Defendants concede they were aware of the '295 Patent at least as of the serving of TLI's Complaints (D.I. 87 at 37), but challenge TLI's statement that "Defendants have 'been aware of the '295 patent since at least November 20, 2013, when [each] was served with a complaint in an action filed on November 18, 2013.'") (*Id*. (citing Apple Compl. at ¶ 32).)  Defendants argue TLI's allegation is implausible and TLI's indirect infringement claim should be split into post-suit and pre-suit, relying on this Court's *Rembrandt* decision.  But that decision found post-suit knowledge sufficient for pleading indirect infringement.  *See Rembrandt*, 950 F. Supp. 2d at 883.

Defendants wish to extend *Rembrandt* to hold that once knowledge is sufficiently alleged for induced infringement, the Court must dismiss a portion of that claim that might apply prior to the date of knowledge alleged.  But that is not the law.  Such a ruling would invite every defendant to move to dismiss a portion of an asserted claim prior to any date alleged in the complaint, even if (i) that date was sufficient, as it was here, to establish the claim, and (ii) Defendants are the only ones with the information that would show an earlier date, *e.g*., whether they knew of the patent earlier (and therefore discovery may show that Defendants had earlier knowledge of the patents).  *See Serv. Solutions U.S., LLC v. Autel U.S. Inc.*, No. 13-10534, 2013 WL 5701063, *10, n. 11 (E.D. Mich. Oct. 18, 2013) (post service knowledge is "enough to sustain Plaintiff's allegations of induced infringement."  "Whether Defendants knew of the patents-in-suit before being served with this lawsuit remains to be determined.  If Plaintiff . . . is ultimately unable to show such pre-service knowledge, damages will only be allowed to the extent that they are the result of induced infringement occurring after the date of service.")

Defendants also challenge their purported depth of this knowledge ("specific intent") (D.I. 87 at 32), despite conceding post-suit knowledge is sufficient for inducement (D.I. 87 at 37), and incorrectly claim the Complaints are "threadbare" in this regard, ignoring TLI's

---

motion to dismiss a non-pled claim is a make-work project and should be denied.  *See Westerngeco L.L.C. v. Ion Geophysical Corp*., No. 4:09-cv1837, 2011 WL 3608382 *17 (S.D. Tex. Aug. 16, 2011).

allegations.  As a threshold matter, Defendants' attorney-created, heightened standard for pleading specific intent is incorrect.  Asserting knowledge of the infringement and continued advertisement of the infringing products despite this knowledge is generally sufficient to plead specific intent.  *In re Bill of Lading*, 681 F.3d at 1341-42 ("[Defendant] is essentially arguing that, at the pleading stage, [plaintiff] must allege facts that prove all aspects of its claims, or at the very least make those claims probable.  But that is not what is required. . . . Common sense indicates that advertising that your product can be used in conjunction with dispatch software to improve asset utilization and provide operational efficiency to the [] shipping/trucking industry gives rise to a reasonable inference that you intend to induce your customers to accomplish these benefits through utilization of the patented method.  This is sufficient . . . .")

TLI's complaints allege Defendants' knowledge of the infringement and that despite this knowledge, Defendants continued to provide and advertise their infringing systems, exceeding the standard for pleading specific intent.  *See In re Bill of Lading*, 681 F.3d at 1341-42; *see, e.g.*, Google Complaint at ¶¶ 21-28 (description of infringing products); 39, 52-56 (description of direct infringement); 37 (defendants' knowledge of the infringement); 38-42 and fn. 12 (despite knowledge of the infringement, defendants continue to infringe and to promote, advertise and supply their infringing systems, and continue to instruct their customers how to infringe).

Defendants' allegation that TLI did not identify specific products is also incorrect.  TLI identified the infringing products in detail.  *See, e.g.*, Google Complaint at ¶ 21 (Exemplary infringing products include "Google +, Picasa, Google Drive and YouTube products.")

Defendants' claim that TLI did not identify the direct infringement at issue is false.  *See, e.g.*, Google Complaint at ¶¶ 52-56, 39 ("The direct infringement induced and contributed to by [Platform Defendant] includes at least the uploading of digital images from mobile devices having telephones to [Platform Defendant] servers by end users acting alone or in combination with [Platform Defendant].")  TLI also identified representative claims 1 and 17.  *See id*. at ¶ 39.

Defendants incorrectly allege TLI did not describe "how" they induce infringement.  *See, e.g.*, Google Complaint at ¶¶ 38-42.  It is hard to image how TLI could have alleged more detail regarding Platform Defendants' specific intent to induce infringement of the '295 patent.

**G.      TLI Withdraws its "Claim" for Enhanced Damages**

TLI withdraws its "claim" for enhanced damages, only found in the Prayer for Relief.

Dated:  November 21, 2014            By:  ___/s/ Philip J. Harvey_____
                                     Philip J. Harvey (VSB #37941)
                                     HARVEY & BINNALL
                                     717 King Street, Suite 300
                                     Alexandria, Virginia 22314
                                     Tel: (703) 888-1943
                                     pharvey@harveybinnall.com

Counsel for Plaintiff
Of Counsel:

Robert A. Whitman
Mark S. Raskin
Eric Berger
Charles Wizenfeld
Mishcon de Reya New York LLP
750 Seventh Ave, 26th Floor
New York, New York 10019
Telephone (212) 612-3270
Facsimile (212) 612-3297

**CERTIFICATE OF SERVICE**

I hereby certify that on November 21, 2014, the foregoing was filed using the Clerk's CM/ECF system, which will provide notice to all counsel of record. There are no *pro se* parties.

By: /s/ Philip J. Harvey
Philip J. Harvey (VSB #37941)
HARVEY & BINNALL, PLLC
717 King Street, Suite 300
Alexandria, Virginia 22314
Tel: (703) 888-1943

pharvey@harveybinnall.com
Counsel for Plaintiff